# IN THE SUPREME COURT OF TEXAS

══════════
No. 12-0255
══════════

GENE E. PHILLIPS, INDIVIDUALLY AND D/B/A PHILLIPS OIL
INTERESTS, LLC, EURENERGY RESOURCES CORPORATION,
SYNTEK WEST, INC., CABELTEL INTERNATIONAL CORPORATION,
NATRON INVESTMENTS, A&B CAPITAL CORPORATION, SOUTHMARK
CORPORATION, BASIC CAPITAL MANAGEMENT, INC., MAY TRUST,
O.S. HOLDINGS, INC., AND ENVICON DEVELOPMENT CORPORATION,
PETITIONERS,

v.

CARLTON ENERGY GROUP, LLC, RESPONDENT

═══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
═══════════════════════════════════════════════

**Argued September 11, 2013**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

Wildcatting is speculative business, especially in a foreign country, but it is business nonetheless. Data is gathered, risks are assessed, deals are reached, and money is made and lost, all in something of a competitive market. An investment is sometimes a roll of the dice but other times a cold calculation. The law does not compensate gambling losses but does afford damages for the reasonable value of interests wrongfully taken.

In this case, the plaintiff and the main defendant both wanted an interest in a coalbed methane exploration prospect in Bulgaria. A jury found that the defendant obtained his interest by tortiously interfering with the owner's contract to convey an interest to the plaintiff. The defendant denies liability but argues that "the key question" is whether the evidence of the fair market value of the plaintiff's lost interest is too speculative to support the jury's award of damages.

That value depends in part on the profits the interest would have generated, which in turn depend, of course, on the associated risks. Texas law is quite clear that lost profits cannot be recovered as damages unless proven to a reasonable certainty, and the defendant argues that the rule applies equally to profits-based value determinations. We agree. But reasonable certainty must be measured in context, and when projected profits are considered in determining the value of a mineral prospect to be actually purchased or sold, the relevant metrics are supplied by the business market that values, invests in, and trades on such interests. Ultimately, the dispute here is not *whether* the rule applies but *how*; in this context and others, "the real difficulty lies not so much in the statement of the rules as it does in the application of the correct rule."[1] We conclude that the requirement of proof to a reasonable certainty does not preclude all recovery in this case, but neither does it permit recovery of all the damages found by the jury.

We affirm the judgment of the court of appeals[2] in part, reverse in part, and remand the case to that court for further proceedings.

---

[1] *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) (quoting *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938)).

[2] 369 S.W.3d 433 (Tex. App.—Houston [1st Dist.] 2012).

**I**

**A**

This case arises out of three relationships—between the owner of a prospect and each of two investors, and between the investors themselves.

*The owner and first investor: CBM and Carlton*

In October 2000, the Republic of Bulgaria granted CBM Energy Limited a three-year concession to explore for coalbed methane in an unproven 450-square-kilometer field in the Dobroudja Coal Basin.[3] The concession required CBM to drill one exploratory well, and if successful, two additional wells. The concession could be extended under similar terms twice for two years each. If CBM made a commercial discovery, it could submit a production development plan for the Bulgarian government's approval, which could not be unreasonably withheld.

CBM could not fund the project itself and immediately inquired whether Carlton Energy Group, LLC, would be interested in partnering with it to help find investors, but Carlton, in the words of one of its principals, "didn't have time to mess with it." That indifference changed in 2003. Still not having raised the funding for the concession, CBM again contacted Carlton, and this time, Carlton expressed interest.

In April, Carlton agreed to pay CBM up to $8 million in three stages or "tranches" for up to a 48% interest in the project. The first tranche of $1.25 million was to cover the various costs for beginning the project and completing the first exploratory well, estimated at $750,000. If the well

---

[3] 450 square kilometers (about 173.75 square miles, or 111,197 acres) is roughly two-and-one-half times the size of the District of Columbia.

was successful, the second tranche, $1.5 million for the two additional wells, was due three months later. The $5.25 million balance of the $8 million was to be paid within a year after the second tranche and would go to further development of the prospect. For each timely paid tranche, Carlton would receive a proportionate share of a 48% interest in the project—7.5%, then another 9%, and finally the remaining 31.5%.

But Carlton, too, needed investors to fund its share of the project, and by October, when the concession was set to expire, none had been found. CBM applied for a two-year extension, and the Bulgarian government agreed but required as one condition that CBM provide a $600,000 letter of credit to ensure completion of the first well.[4] CBM could not meet even this requirement on its own and again turned to Carlton for aid. In April 2004, CBM and Carlton amended their agreement, retaining the same basic structure, but lowering the first tranche to $900,000, raising the second to $1.85 million, and adjusting the proportionate shares acquired in the first and second tranches to 5.4% and 11.1%, respectively. The $900,000—the $600,000 letter of credit required by the Bulgarian government and $300,000 cash—was to cover most of the cost involved in completing the first well, again estimated at $750,000. The second tranche, still due within three months of the first, was for the completion of the remaining two wells.

To fund the first tranche, Carlton turned to Robert Assil and Kenneth Scholz, two friends of one of its principals, Thomas O'Dell. Assil provided $600,000 for the letter of credit, half of which was a loan to O'Dell, and Scholz sent CBM $300,000 cash. O'Dell, Assil, and Scholz agreed they

---

[4] The government also reduced the size of the area covered by the commission to 418 square kilometers (about 160.39 square miles, or 103,290 acres) and required that up to four appraisal wells be drilled after the first three to obtain development financing.

would form a joint venture with Carlton to hold Carlton's 48% interest in the project, each owning one-fourth of the venture.

In tendering his $300,000, Scholz wrote CBM directly:

> In order to achieve ample time to properly evaluate the initial well, it is requested that a minimum time of 90 days from the final date of funding or 45 days from the receipt of logs, whichever is later, be granted. If this request is unacceptable, please return my funds . . . .

CBM responded by letter to Carlton that it would "not agree to such terms":

> Mr. Scholz' attempt to wire the $300,000.00 to CBM with conditions attached does not constitute performance and is not acceptable to CBM. Again, CBM will not agree to any such extension of the deadline for funding the second tranche of funding, 45 days or otherwise.

Carlton replied, asserting that Scholz's condition on his tender was no different from an oral amendment the parties had made to their agreement to delay funding the second tranche until 30 days after Carlton reviewed logs from the initial well:

> The conditions set out by Dr. Scholz for the transfer of funds are substantially the same as the conditions set out in the [Carlton]-CBM Agreement as amended, i.e. the second tranche funding to take place within 90 days of the funding of the initial tranche, with the caveat that [Carlton] will have no less than 30 days to review the logs from the initial well. Although not in the [Carlton]-CBM Agreement, this 30 day period to review the logs was verbally agreed between Mr. O'Dell of [Carlton] on behalf of the investor group and Mr. Cook of CBM and discussed with Mr. Ray Pilcher of Raven Ridge Resources who advised at the time that he saw that as a reasonable request and had no objections. [Dr. Scholz] has agreed to the 30 days. . . . Carlton considers that the funding requirement under the [Carlton]-CBM Agreement has been fully complied with . . . .

CBM did not object to these assertions or refuse to accept Scholz's money.

5

Carlton and CBM continued to work toward funding the project. Carlton offered interests to numerous recognized investors, as it had before the extension. All declined.[5]

*The two investors: Carlton and Phillips*

One potential investor, D. W. Mitchell, asked an acquaintance, Dr. Henry Crichlow, to evaluate the Bulgarian project. Crichlow, a professional engineer and a former University of Oklahoma professor and department chair, is a leading expert on oil and gas reservoirs, including coalbed methane formations. From Raven Ridge Resources, a consulting firm and part owner of CBM, Crichlow obtained information on the project developed in part to help CBM market the investment opportunity. Crichlow reported in June that the project had "several highly desirable characteristics" that made it "a valuable international project." He listed, among others: "existing exploratory drilling in 142 boreholes", "known production technology for coal bed gas extraction", "extremely high demand for gas in Eastern Europe", "high price for wellhead gas at $5.25/MMBtu", "pipeline availability", and "available major oil company partners for additional development programs". Analyzing all available data, Crichlow valued the gas in the ground at $31.5 billion—a total volume of 35,000 bcf, 90% of which (31,500 bcf) was recoverable, worth $1/MMBtu (about $1/Mcf).[6]

---

[5] These included Exxon Mobil Exploration; China United Coalbed Methane Corporation; Dynoil Refining, L.L.C.; Monoco Petroleum; AFEX International; Abercia Enterprises; KMA Petroleum Company; Capco Energy; Reiser Oil & Gas; Loon Energy; V Cleveland Oil Company, LLC; Titan Partners, LLC; Kohlberg, Kravis and Roberts; Landye, Bennett and Blumstein; Stoel River, LLP; as well as numerous individuals.

[6] The term "Mcf" means one thousand cubic feet, "bcf" means one billion cubic feet, and "MMBtu" means one million British thermal units. *See* U.S. Energy Info. Admin., *Glossary*, http://www.eia.gov/tools/glossary/ (last visited May 4, 2015); *see also* U.S. Energy Info. Admin., *Frequently Asked Questions: What are Ccf, Mcf, Btu, and therms? How do I convert natural gas prices in dollars per Ccf or Mcf to dollars per Btu or therm?*, http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 (last visited May 4, 2015).

Mitchell gave Crichlow's report to Gene Phillips, a Dallas businessman who expressed interest in the project. Carlton offered Phillips a 10% interest in the project for $8.5 million, which would more than cover its obligations to CBM and leave it with 38% of the project. (Carlton and its joint venturers, O'Dell, Assil, and Scholz, agreed to contribute equally to the interest sold to Phillips, leaving them each with 9.5% of the project.) Carlton sent Phillips a proposed agreement between itself and Phillips Oil Interests, LLC, which Phillips signed, dated August 23, 2004, and returned to Carlton with the following added at the bottom:

> Phillips Oil Interests, LLC will have a 30 day period to review all documentation and technical information in connection with the above described project. If for any reason Phillips Oil Interests, LLC is not satisfied with their investigation then they will withdraw from this Agreement.

Carlton signed the agreement shortly after receiving it. Phillips denied ever receiving a copy of the fully executed agreement.

Two weeks later, Phillips and Crichlow met with O'Dell in Carlton's offices to discuss the Bulgarian project. After that meeting, Crichlow continued to study the prospect, becoming even more convinced of its value. In early October, Phillips and Crichlow spent a day at Raven Ridge's offices reviewing data. On October 11, Crichlow produced a second report referring to the project's "billion dollar profit potential". Crichlow urged Phillips to formally withdraw from his agreement with Carlton "as soon as possible" and take over Carlton's position with CBM, adding:

> Legal advice should be sought by the Phillips Group (PG) regarding the supplanting of the Carlton Energy position with the Phillips Group under the same 48% interest position in the CBM Project, including the principal payback provision. Everything would be based on CBM declaring Carlton in default of their original contract in writing and pursuing the Phillips Group for the Project funding. Care should be taken to insure there is no potential Phillips Group liability for "tortuous

7

[sic] interference" directed at Phillips, for the termination of the contract between CBM and Carlton.

[] A partnership with CBM is highly recommended considering the quality and experience of the ownership and management. [Raven Ridge Resources] and CBM have been involved in this project for over six years. It is very unusual to have the amount of data available for a project of this type and the extreme enthusiasm for success that was expressed by the principals of such a highly respected industry leader such as Raven Ridge Resources. These factors greatly reduce the investment risk in this type of project.

Within days, Phillips made known to CBM that he had no interest in dealing with Carlton and wanted to partner with CBM in Carlton's place. Belying his negotiations with CBM, Phillips wrote Carlton on December 3 that "we are unable to make a determination to participate in this venture" and therefore "decline to go forward with any proposed transaction." Carlton unsuspectingly responded: "Hopefully, it is not too late to reconsider, depending of course, on your other time and financial commitments."

*The owner and the second investor: Phillips and CBM*

Phillips moved quickly to supplant Carlton in the project. In mid-January 2005, he met with the Bulgarian Minister of Energy for assurance that the second two-year extension would be granted if CBM completed just one of the required wells. About the same time, Phillips renamed a dormant company he controlled and partly owned, EurEnergy Resources Corp., to contract with CBM. On February 11, CBM executed an agreement giving EurEnergy 60% of the project for $6.5 million, though unlike Phillips's agreement with Carlton, it required EurEnergy to bear CBM's development and operating costs. CBM agreed to declare Carlton in default, and EurEnergy agreed to indemnify CBM from any claims by Carlton. On February 25, CBM wrote to Carlton, stating that Carlton had

8

violated their agreement, citing the "restrictions and conditions" on Scholz's $300,000 tender and Carlton's failure to fund the second tranche. CBM offered to refund Carlton's $900,000 "in the interest of preserving good relations". Carlton responded, protesting all of CBM's assertions, but in the end, accepted CBM's offer of a refund.

By July, EurEnergy had demanded control of the project from CBM, and litigation between them ensued. They settled in May 2006, with EurEnergy buying CBM for $4.5 million.

*　　　*　　　*　　　*　　　*

The first exploratory well, the Vranino #1, was spudded in August 2005 and drilled to depth by October, barely in time to gain the second two-year extension of the concession. But final completion and testing were delayed by the litigation and other things. October 2005 and March 2006 estimates by Crichlow indicated that preliminary testing showed the well to be capable of commercial production, but EurEnergy was not able to convince the Bulgarian government that commercial production had been achieved. Drilling of the other two wells never commenced, and the concession terminated in October 2007. Crichlow's final report in November 2007, based on more extensive tests performed on the Vranino #1, showed recoverable gas reserves of 3.03 bcf per well, indicating a large reservoir, though only 65% of the recoverable volume projected in his June 2004 report. But EurEnergy and Phillips lost $13 million that they invested in the project.[7]

---

[7] Crichlow's 2007 report estimated only coalbed recoverable gas reserves, and not the total recoverable reserves from the concession, unlike his June 2004 report. The earlier report projected that of the 31,500 bcf total recoverable reserves, 20%, or about 6,300 bcf, were in coal strata. If one assumes 1,350 wells, as the 2004 report did, applying the estimate of 3.03 bcf per well from the 2007 report would result in total reserves of 4,090.5 bcf (1,350 x 3.03)—only about 65% of the 2004 report's estimate (4,090.5/6,300), but still a very large volume. The 2007 report concluded that "the calculated extractable gas quantities in the draining zone of well #1 [was] commercial." Put simply, the Vranino #1 proved potentially profitable and indicative of a large reservoir.

9

**B**

In December 2006, Carlton sued Phillips, EurEnergy, and Phillips-related entities CabelTel International Corporation and Syntek West, Inc., alleging a breach of the August 2004 Carlton-Phillips Oil contract and tortious interference with the April 2004 CBM-Carlton contract. Carlton claimed damages for the loss of its 38% interest in the project. To prove the fair market value of that interest, Carlton relied on Crichlow's testimony and reports, and the testimony of Dr. Pete Huddleston, another professional engineer with extensive experience consulting in oil and gas exploration. From the two of them, Carlton offered evidence of three models for determining the fair market value of its 38% interest in the concession.

First, Huddleston testified that the value of that interest could be derived from the value of the gas in the ground, as forecast by Crichlow. As explained above, in June 2004, Crichlow estimated from the available data that the concession contained 35,000 bcf, that 90% (31,500 bcf) was recoverable, and that the gas was worth $1/MMBtu (about $1/mcf), assuming an approximately $5/MMBtu price at the wellhead and accounting for drilling, production, operation, and royalty costs. Based on those figures, the gas was worth $31.5 billion. Huddleston thought a recovery rate of 70%–85% was more reasonable, which would put the value of the gas in the ground at $24.5–$29.75 billion. Thirty-eight percent of that is $9.31–$11.305 billion. But Huddleston did not testify that a 38% interest in the concession was actually worth that amount. He explained that he was merely offering the jury "a range, a considerable range" of values. Huddleston did not consider whether Crichlow's November 2007 report, based on the Vranino #1, indicated that total reserves were only a fraction of what he projected more than three years earlier.

10

Second, Huddleston estimated the value of the concession if wells were drilled only in the vicinity of the Vranino #1. Assuming that only eight additional wells were drilled around the Vranino #1 at a cost of $1 million per well, that a well could produce 2 bcf of gas, and that the success rate would be 80%, Huddleston determined the total net income from the wells, applied a discount factor, and estimated the value of the prospect to be about $33 million. Assuming 32 additional wells were drilled and a success rate of only 60% (less certain because they would be farther from the Vranino #1),[8] Huddleston estimated the value of the prospect to be about $100 million. The value of a 38% interest would thus be $12.54–$38 million.

Third, Huddleston assumed that Phillips's agreement to pay Carlton $8.5 million for a 10% interest in the prospect showed that the value of the entire prospect was $82 million—$85 million less the $3 million cost of drilling the three required wells[9]—and thus, the value of a 38% interest would be $31.16 million. Huddleston acknowledged that he had not made the same calculation based on CBM's agreement to sell EurEnergy a 60% interest in the concession for $6.5 million, explaining that EurEnergy's obligations to pay development expenses were greater than Phillips's obligations to Carlton or Carlton's to CBM. But Huddleston also did not make the same calculation for the CBM-Carlton agreement, which allocated expenses in the same way the Carlton-Phillips agreement did. Carlton agreed to pay CBM $8 million for a 48% interest in the prospect, which yields a value

[8] Huddleston also estimated that his minimum and maximum numbers covered "a little better" than 3% of the concession.

[9] Huddleston explained that Carlton was in effect giving a "carried interest" there because he would have had to pay for 100% of the three wells, which Huddleston assumed would be $1 million per well, presumably based on Crichlow's estimate. Note, however, that Carlton's agreements with CBM both estimated the cost of the first well to be $750,000, and assumed that the second tranche—$1.25 million or $1.85 million—would pay for the second and third wells, among other things.

11

of $5,193,333.33 for a 38% interest.[10] Nor did Huddleston calculate the value of the prospect based on Assil's and Scholz's payments of $300,000 for a 12% interest under the CBM-Carlton agreement, later reduced to 9.5%, which yields a value of only $60,000 for a 38% interest.[11]

Phillips and EurEnergy offered no evidence of the value of the prospect, though their counsel argued to the jury in summation that the "best evidence of fair market value" was the $900,000—for 5.4%—that Carlton had already been repaid. Carlton's counsel in his summation did not mention either of Huddleston's first two methods and argued only that the fair market value of Carlton's lost interest should be based on its contract with Phillips—"you can write it down. It's $31,160,000. That is 38% of $82 million."

The jury returned a verdict for Carlton as follows:

- *The Carlton-Phillips Oil contract.* The jury found that Carlton consented to the contract before receiving Phillips's December 3 termination letter, even though Phillips denied ever receiving a fully executed copy, and that Phillips Oil breached the contract. The jury refused to find that Phillips sent the termination letter in compliance with the 30-day review provision, or that the breach was excused.

- *The CBM-Carlton contract.* The jury found that Carlton timely funded the first tranche, despite CBM's initial complaints about Scholz's tender; that CBM agreed to defer funding of the second tranche until after receipt of logs for the initial well; that CBM breached, despite its assertions that Carlton had breached; and that Phillips and EurEnergy tortiously interfered with the contract. The jury refused to find that Phillips or EurEnergy had a good-faith belief in any right to act as they did, finding instead that they acted with malice.

---

[10] Using Huddleston's analysis, if 48% of the prospect was worth $8 million, 100% was worth $16,666,666.66, less the drilling costs for three wells. If drilling costs per well were $1 million per well (rather than $750,000 estimated for the first well in the Carlton agreement), the remainder would be $13,666,666.66, 38% of which equals $5,193,333.33.

[11] Again, using Huddleston's analysis, if 9.5% of the prospect was worth $300,000, 100% was worth $157,894.74 ($3,157,894.74 less the $3M drilling costs), 38% of which equals $60,000.

- *Actual damages.* The jury found that the fair market value of Carlton's interest in the Bulgarian project at the time of the breach of contract and the tortious interference was $66.5 million.

- *Exemplary damages.* The jury assessed $8.5 million exemplary damages against Phillips and EurEnergy, each.

- *Alter ego.* The jury found that Phillips was responsible for EurEnergy's conduct, and that CabelTel and Syntek were both alter egos of EurEnergy.

The trial court refused to render judgment for the $66.5 million actual damages found by the jury and suggested a remittitur to $31.16 million, the figure Carlton's counsel argued in summation. Carlton accepted the remittitur in lieu of a retrial but reserved the right to seek the higher amount on appeal. The trial court determined that Carlton's tortious interference claim provided it the greater recovery and rendered judgment for the remitted actual damages and the exemplary damages found by the jury. The trial court refused to render judgment against Syntek West and CabelTel based on the jury's alter ego findings, but did render judgment against EurEnergy as Phillips's alter ego.

Carlton, Phillips, and EurEnergy appealed. The court of appeals reversed the trial court's judgment in part and rendered judgment on the verdict, awarding Carlton the $66.5 million actual damages found by the jury, as well as exemplary damages, and including CabelTel and Syntek West as EurEnergy's alter egos.[12]

Phillips and EurEnergy petitioned this Court for review, as did CabelTel and Syntek West.[13] Because Phillips and EurEnergy take the same positions, we refer to them jointly as Phillips, unless the context indicates otherwise. We begin with Phillips's arguments regarding liability, then turn to

---

[12] 369 S.W.3d 433 (Tex. App.—Houston [1st Dist.] 2012).

[13] 56 Tex. Sup. Ct. J. 396 (March 29, 2013).

his arguments regarding damages, and conclude with the arguments of CabelTel and Syntek West on alter ego.

## II

Phillips unquestionably induced CBM to terminate its agreement with Carlton, but for several reasons, he contends he is not liable for tortious interference. His arguments either confront adverse jury findings, which he must show are unsupported by the evidence, or are based on facts the jury refused to find, which he must show are conclusively established in the evidence.[14]

Phillips argues that his negotiations with CBM occurred after Carlton had already failed to comply with its agreement with CBM, giving CBM the right to terminate. In effect, Phillips attacks the jury findings that Carlton complied with its agreement with CBM, and that they had agreed to the timing of the second tranche. Phillips argues that Carlton never funded the first tranche because Scholz's tender of $300,000 cash was improperly conditioned on review of the logs of the first well. Though CBM did complain of the condition at first, Carlton immediately responded that the condition was consistent with their oral agreement to delay funding of the second tranche until after the first well was drilled. Phillips argues that it would have been absurd for CBM to agree to delay funding of the second tranche until after uncertainties in the value of the prospect were dispelled by the drilling of a well—like conditioning payment for a lottery ticket on the results of the drawing. But CBM did not raise any objection at the time or deny Carlton's assertion that it "had fully

---

[14] *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) ("A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact.").

complied" with their agreement. The jury could easily have believed that CBM thought it more important to have money in hand and continue to work with Carlton to find investors in the project. And the jury could also have believed that when CBM did eventually object, months later, it was due solely to Phillips's prodding. There was evidence to support the jury's findings that Carlton complied with the agreement's requirements for funding the first and second tranches.

Alternatively, Phillips argues that even if he tortiously interfered with the Carlton-CBM contract, Carlton suffered no injury. Carlton, the argument goes, had demonstrated no financial ability to perform the agreement without Phillips's investment, and he and Carlton never reached a binding agreement before he withdrew his offer. The jury found that Phillips and Carlton did have an agreement, which he breached, and that his attempt to terminate it was ineffectual. Phillips argues that there is no evidence to support these findings.

There is no dispute that Phillips, after receiving Carlton's offer to invest in the project, added two sentences, signed it, dated it August 23, 2004, and returned it to Carlton. Carlton's principal, O'Dell, testified that he signed the agreement shortly after he received it, but he did not recall sending Phillips a signed copy, and Phillips denies receiving one. Nevertheless, there is evidence that in the weeks that followed, Carlton and Phillips behaved as if they had an agreement. They met together to discuss the project and obtained and evaluated information from CBM and Raven Ridge. Tellingly, in his October report to Phillips, Crichlow, whom Phillips had by then hired as a consultant, believed that Phillips had a contract with Carlton and urged him to withdraw from it and negotiate with CBM directly.

15

Phillips argues that notwithstanding O'Dell's testimony that he signed the counter-offer, the lack of evidence that a signed copy was ever delivered to Phillips precludes a finding that the parties had a binding agreement. But while signature and delivery are often evidence of the mutual assent required for a contract,[15] they are not essential.

> Texas law recognizes that a contract need not be signed to be "executed" unless the parties explicitly require signatures as a condition of mutual assent. If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his unconditional assent thereto, there is a written contract.[16]

The evidence that Carlton and Phillips continued to gather and assess information regarding the project as joint venturers, Crichlow's understanding that Carlton and Phillips had an agreement, and Phillips's efforts to supplant Carlton, as Crichlow recommended, all strongly suggest that Carlton and Phillips had mutually assented to the August 23, 2004, written agreement. There is evidence to the contrary. Phillips points out that Carlton never set up the joint venture entity called for in the agreement, that the parties never had a formal closing, and that Carlton did not tender its working interest due before any payment from Phillips. Further, Phillips argues, there is evidence that O'Dell himself did not think the parties had a firm agreement. But this says no more than that the evidence was disputed; evidence tending to show the lack of an agreement was far from conclusive. The jury could have believed that any delays in performance—the formation of the joint venture, the closing,

---

[15] *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Contracts require mutual assent to be enforceable. Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind." (citations omitted)).

[16] *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010) (quoting *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1956), which in turn quotes 1 CORBIN ON CONTRACTS § 31 (1950)). Phillips argues that the trial court erred in refusing to instruct the jury that delivery was required. That instruction was not a correct statement of law.

the tender of initial funding—were because the parties were otherwise occupied in gathering and assessing information, or due to Phillips's foot-dragging.

Phillips argues that Carlton waived any contractual rights it had by not asserting them immediately upon receiving Phillips's letter "declin[ing] to go forward with any proposed transaction." The jury refused to find waiver, and the evidence does not establish it. The jury could reasonably have believed that Carlton's response adopted a non-accusatory tone in hopes Phillips would follow through on his obligations. Carlton had no duty to assert claims against Phillips before it did, and its delay was not, as a matter of law, a waiver of its rights.

We conclude that the evidence supports the jury's findings relating to tortious interference and fails to conclusively establish facts negating liability that the jury refused to find. Phillips's arguments that he is not liable for tortious interference fail.

### III

We come to Phillips's principal argument: that Carlton's evidence of the fair market value of a 38% interest in the Bulgarian project under the CBM-Carlton agreement is too speculative to support an award of damages. We begin by stating the proper standard of review, then apply that standard to the evidence in this case.

### A

A property's fair market value is what a willing buyer would pay a willing seller, neither acting under any compulsion.[17] Fair market value is generally determined either by using comparable

---

[17] *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) ("Market value is what a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell." (citation and internal quotation marks omitted)).

market sales, calculating replacement cost less depreciation, or capitalizing net income[18]—that is, profits.[19]

With respect to the recovery of lost profits as consequential damages, the law is well-settled: lost profits can be recovered only when the amount is proved with reasonable certainty.[20] Proof need not be exact, but neither can it be speculative.[21] The reasonable certainty requirement "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise."[22] But

> [p]rofits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.[23]

---

[18] *E.g. City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) ("The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method."); *see also State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009) ("The income approach consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value.").

[19] *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002) ("Lost profits are damages for the loss of net income to a business measured by reasonable certainty.").

[20] *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) ("The generally accepted rule is that, where it is shown that a loss of profits is the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." (citation and internal quotation marks omitted)).

[21] *Id.* ("So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness." (citation and internal quotation marks omitted)).

[22] *Id.*

[23] *Id.*

"It is impossible to announce with exact certainty any rule measuring the profits the loss for which recovery may be had."[24] "What constitutes reasonably certain evidence of lost profits is a fact intensive determination."[25] We have denied recovery of lost profits that the claimant contended would have been realized from the bid that would have been offered on a construction project had the claimant known the truth about site conditions;[26] from retirement accounts taken by a competitor;[27] from a lost opportunity to develop and market a new, unique, voice-prompted, programmable thermostat;[28] from the lost use of a bulldozer;[29] and from the sale of oil and gas leases, had defendant drilled a second well as agreed, even though the first well was a dry hole.[30] We have upheld recoveries of lost profits from an established account of an asbestos abatement business;[31] from farmers' crop loss;[32] from an established florist shop;[33] from an established cigarette vending

---

[24] *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938).

[25] *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

[26] *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49–51 (Tex. 1998).

[27] *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649–650 (Tex. 1994).

[28] *Tex. Instruments*, 877 S.W.2d at 277.

[29] *Holt Atherton*, 835 S.W.2d at 85–86.

[30] *Whiteside v. Trentman*, 170 S.W.2d 195, 196–197 (Tex. 1943) (affirming the court of appeals's reversal of a judgment for the plaintiff, but noting, though defendant did not appeal, that it could not be said as a matter of law that plaintiff would be unable to make a showing of lost profits on remand).

[31] *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876–880 (Tex. 2010) (reversing and remanding the issue to the court of appeals).

[32] *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505–506 (Tex. 2001).

[33] *White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262–263 (Tex. 1983).

business;[34] and from selling car batteries (in the 1930s).[35] The only common thread running through these cases is the necessity that the claim of lost profits not be hypothetical or hopeful but substantial in the circumstances.

But while whether to allow a recovery of lost profits is a fact-dependent inquiry, "[t]his does not mean . . . that the 'reasonable certainty' test lacks clear parameters."[36] "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained."[37] Though the breach or tort may be clear, profits "not susceptible of being established by proof to that degree of certainty which the law demands" cannot be recovered as damages.[38] Still,

> courts draw a distinction between uncertainty merely as to the amount and uncertainty as to the fact of legal damages. Cases may be cited which hold that uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery. A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages.[39]

While we have never spoken to whether this requirement of reasonable certainty of proof should apply when lost profits are not sought as damages themselves but are used to determine the market value of property for which recovery is sought, it clearly must. The purpose of the

---

[34] *Pace Corp. v. Jackson*, 284 S.W.2d 340, 348–350 (Tex. 1955).

[35] *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098–1099 (Tex. 1938).

[36] *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

[37] *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

[38] *Sw. Battery Corp.*, 115 S.W.2d at 1099.

[39] *Id.*

requirement is to prevent recovery based on speculation. We can think of no reason, and Carlton suggests none, why it would make sense to deny damages based on speculative evidence of lost profits but allow recovery of lost value based on the same evidence.

But when evidence of potential profits is used to prove the market value of an income-producing asset, the law should not require greater certainty in projecting those profits than the market itself would. The reasonable certainty requirement serves to align the law with reality by limiting a recovery of damages to what the claimant might have expected to realize in the real world had his rights not been violated; the requirement should not be used to deny a claimant damages equal to the value the market would have placed on lost property. The prospect of winning millions in the lottery is too small to support any award of potential proceeds for, say, theft of a ticket; still the ticket itself has some value—the price it commands on the market. The law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking.[40] But the law need be no more skeptical of claimed market losses than the market itself is.[41]

---

[40] In the memorable words of Don Meredith, the reputed origin of this aphorism, "If ifs and buts were candy and nuts, we'd all have a Merry Christmas."

[41] The United States Court of Appeals for the Second Circuit has observed:

> The market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time. It represents what a buyer is willing to pay for *the chance* to earn speculative profits. Therefore, it is appropriate to apply these proof requirements more leniently than is the case with proof of lost profits.

*Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000). We are not persuaded that a recovery of lost market value based on projected profits is different from a recovery of lost profits because lost market value is measured at a single point in time. Capitalization of future lost profits is also based on a single moment in time. But we do think that in determining lost value, the requirement of reasonably certain proof should be applied—we would not say "leniently"—with the market's view in mind. *See also* 1 DAN B. DOBBS, LAW OF REMEDIES § 3.3(3) (2d ed. 1993) ("Using that market price

**B**

Carlton argues that the jury's finding of $66.5 million is supported by Huddleston's testimony and Crichlow's reports regarding the value of the gas in the ground. Crichlow's June 2004 report projected that the concession contained 35,000 bcf, that 90% (31,500 bcf) was recoverable, that the wellhead price would be more than $5/MMBtu (about $5/mcf), and that the gas in the ground was worth $1/MMBtu (about $1/mcf), after subtracting drilling, production, operation, and royalty costs. Based on those four projections, the gas would be worth $31.5 billion, and a 38% interest would therefore be worth $11.97 billion. Huddleston applied what he considered to be a more realistic recovery rate of 70%–85%, which reduced the value of the interest to $9.31–$11.305 billion. But the jury found the value of the interest to be only $66.5 million, less than 1% of Huddleston's and Crichlow's figures. Carlton argues that the jury believed that the concession contained only 1% of the gas Crichlow forecast and that only 50% was recoverable, so that the total value of the gas under the concession was $175 million, 38% of which is $66.5 million.

Merely laying out the calculation, with its sweeping assumptions, demonstrates how completely conjectural it is. The evidence provides no basis for determining the reliability of Crichlow's volume predictions. Indeed, his own November 2007 report, based on the Vranino #1, indicated that total reserves were only a fraction of what he had projected in 2004. The evidence provides no basis for assessing the risks of completing the three wells necessary to hold the

_____

instead of guessing about profits he might have earned is one very useful way of dealing with the uncertainty of the future."); 3 DOBBS § 12.2(3) (suggesting that "hybrid" damages—which are consequential insofar as they are not the loss of the very thing promised in a contract, but nonetheless a market loss rather than a profit loss—should be governed by the Reasonable Certainty Rule applied "leniently").

concession, much less the risks of actually getting the gas to market. Carlton's experts projected that the costs of bringing the gas to market would be four times the value of the gas in the ground, but the evidence does not explain why that projection was reasonable. There was no history of coalbed methane production in Bulgaria or the general area to support the risk analysis, a new transmission line would be necessary to reach an existing pipeline, and economies of scale would require not three, but hundreds, of wells in the area. In fact, the costs of completing the Vranino #1 greatly exceeded Phillips's expectations.

Most importantly, while Crichlow provided data used by Huddleston to project the value of the gas in the ground, Crichlow did not himself testify that the gas was actually worth $31.5 billion. Huddleston emphasized that he, too, was not testifying to the value of the gas in the ground, but was merely offering the jury "a range, a considerable range" of values to consider. Carlton did not argue to the jury that the value of its 38% interest was anywhere near Huddleston's projections. Nothing in the evidence supports the jury's $66.5 million finding.

Carlton argues alternatively that there is evidence that the value of its 38% interest in the concession was as much as $38 million, based on Huddleston's second damage model, projecting production around the Vranino #1. But this model rests on much of the same conjecture as the gas-in-the-ground model. Huddleston assumed drilling costs based on 2004 projections which were demonstrably unrealistic. He assumed that the drilling prerequisites to continuing the concession would be met, and that when gas was produced, there would be some way to get it to market. He assumed success rates and production volumes that he presumed to be reasonable, without supporting evidence beyond the parties' agreements. He factored in risks broadly, applied a discount

factor, and suggested that the value of the concession was between $33 million and $100 million, again without attempting to arrive at a definite value. Huddleston's second model was no less speculative than the first.

Finally, Carlton argues that there is evidence to support Huddleston's determination of the value of Carlton's 38% interest in the prospect based on Phillips's agreement to pay Carlton $8.5 million for a 10% interest. Simply extrapolating, Huddleston calculated that the entire prospect was worth $85 million less $3 million to drill the three required wells, and thus that the value of a 38% interest was $31.16 million. This calculation is based on an actual offer by a willing buyer—Phillips—to a willing seller—Carlton. While Huddleston's other models were based on unverifiable assumptions regarding what the concession would actually produce, in this third model those assumptions were subsumed in the assessment of the data by real investors in a market in which such interests are sold. Huddleston testified that there is widespread interest in investment in oil and gas development projects, based on available data, much like that available for the Bulgarian prospect. Phillips argues that there was no real market for the Bulgarian prospect, that CBM and Carlton had made every effort to locate potential investors in the prospect, that all had declined, and that in the end, there was at best a market of one: himself. But there were at least three other investors. Carlton had agreed to pay CBM $8 million for a 48% interest in the prospect.[42] Using Huddleston's simple

_____

[42] If 48% of the project is valued at $8 million, then it could be extrapolated that 100% would be valued at $16,666,666 million.

extraction would yield a value of $13,666,666.66 for the entire project,[43] and a value of $5,193,333.33 for a 38% interest. And Assil and Scholz each agreed to pay Carlton $300,000 for a 12% interest that was later reduced to 9.5%; applying Huddleston's formula to their payments would yield a value of only $60,000 for a 38% interest. Phillips argues that the amounts the only other investors were willing to pay shows that the value of Carlton's interest was much less than what even he was willing to pay. Phillips is entitled to argue that the jury's verdict was against the great weight and preponderance of the evidence, an issue we must leave to the court of appeals. But we cannot hold that the amount Phillips was willing to pay Carlton, for the very interest at issue, is not some evidence to support the verdict.

Phillips argues that his agreement with Carlton precludes use of the amount paid to indicate value. The agreement stated:

> The consideration paid by the Parties, respectively for their respective Interest, does not bear any relationship to the projected profits, book value, or other recognized criteria of evaluation of the Project. The consideration has been acknowledged and agreed to by the Parties after a diligent review of the information available on the Project.

The provision curiously states that Phillips's payment was based on "a diligent review of the information available on the Project" but bore no relationship to "recognized criteria of evaluation". Whatever the meaning and intent of the provision, it cannot detract from the fact that a 38% interest

---

[43] As explained earlier, Huddleston concluded—from Phillips's agreement with Carlton to pay $8.5 million for a 10% interest—that the total value of the project would be $85 million, less $3 million as the estimated cost of drilling three wells. Huddleston suggested that a deduction for the $3 million cost of drilling three wells should be made because Carlton was in effect granting a "carrying interest" via his agreement with CBM. In any case, Huddleston's rationale for making such a deduction should be equally applicable to a valuation derived from the $8 million Carlton agreed to pay for a 48% share. Based on those numbers, 100% of the project would be valued at $16,666,666.66. Subtracting $3 million, as the cost of drilling three wells, from $16,666,666.66 would leave $13,666,666.66.

25

in the prospect was sold by a willing seller to a willing buyer.

The trial court suggested a remittitur from the $66.5 million damages found by the jury to the $31.16 million based on Huddleston's third model. Carlton accepted the remittitur in lieu of a new trial, reserving the right to complain that judgment should have been rendered on the verdict. Phillips has argued that the evidence is factually insufficient to support the judgment. The court of appeals did not address these issues, and they may be raised on remand.

## IV

We come finally to CabelTel's and Syntek West's arguments that they are not liable as alter egos of EurEnergy. All three entities were controlled by Phillips. EurEnergy was owned 80% by Southmark Corporation, a publicly traded company Phillips controlled, and 20% by Syntek West (through two wholly owned subsidiaries), which Phillips owned.[44] CabelTel is a publicly traded company owned 69% by Phillips. EurEnergy was managed by a CabelTel employee, Dave Morgan, who reported to Syntek West's general manager, Neil Crouch, EurEnergy's only officer and director.

The parties agree that because EurEnergy was incorporated in Nevada, the law of that state controls.[45] But they do not agree what Nevada law is or how it applies in Texas.

---

[44] Syntek West owned 100% of the shares in OS Holdings, Inc., which owned 100% of the shares in Envicon Development Corp., which owned 20% of the shares in EurEnergy.

[45] TEX. BUS. ORGS. CODE § 1.104.

26

**A**

The alter ego doctrine was first recognized by the Nevada Supreme Court in 1957 in *Frank McCleary Cattle Co. v. Sewell*.[46] The court held that a judgment rendered against one corporation could be enforced by execution against a second corporation, owned by the same two people, with the same president, to which all the assets of the first corporation had been transferred for tax reasons.[47] Borrowing from California law, the Nevada court laid out the requirements for the application of the alter ego doctrine as follows:

> (1) The corporation must be influenced and governed by the person asserted to be its alter ego. (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice. It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice.[48]

In 2001, the Nevada Legislature codified *McCleary*'s requirements in Section 78.747 of the Nevada Revised Statutes, which states:

> 1.      Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.
>
> 2.      A stockholder, director or officer acts as the alter ego of a corporation if:
>
> (a)      The corporation is influenced and governed by the stockholder, director or officer;

---

[46] 317 P.2d 957 (Nev. 1957), *overruled in part on other grounds by Callie v. Bowling*, 160 P.3d 878, 880 (Nev. 2007).

[47] *Id.* at 282.

[48] *Id.*

27

(b)     There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and

(c)     Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

3.     The question of whether a stockholder, director or officer acts as the alter ego of a corporation must be determined by the court as a matter of law.[49]

**B**

CabelTel and Syntek West contend that Section 78.747, by prescribing the requirements for alter ego liability of a shareholder, director, or officer for a corporate debt, preempts alter ego liability for any other person under Nevada common law. Therefore, they argue, because they were not shareholders in EurEnergy, they cannot be liable as its alter egos.

We do not read Section 78.747 to have such an effect. On its face, the statute does nothing more than confine shareholder, director, and officer liability for corporate debts to the common law alter ego doctrine established in *McCleary*, a case piercing the corporate veil between two corporations that were not shareholders, directors or officers of each other, and reiterated in Nevada Supreme Court decisions over three decades.[50] The statute would preclude a common law expansion

---

[49] NEV. REV. STAT. § 78.747 (2013).

[50] *Viega GmbH v. Eighth Jud. Dist. Ct. of the State*, 328 P.3d 1152 (Nev. 2014) (local subsidiaries' contacts with state can sometimes be imputed to the subsidiaries' foreign parent companies on an agency theory, without also establishing the prerequisites of the "alter ego" doctrine; because plaintiffs failed to assert and prove up sufficient facts, the court granted relief to prohibit the trial court's exercise of personal jurisdiction) (a concurring opinion deemed agency insufficient and would always require the alter ego doctrine prerequisites); *Rock Bay, LLC v. Eighth Jud. Dist. Ct. of Nev.*, 298 P.3d 441, 443, 446 n.5 (Nev. 2013) (a judgment creditor who sought discovery of a nonparty's assets based on an alter ego theory would have to establish by a preponderance of the evidence that (1) the nonparty is "influenced and governed by" the judgment debtors, (2) there is a "unity of interest and ownership" between the two such that they are essentially the same company, and (3) "adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice"(internal quotation marks omitted)); *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 660 (Nev. 2008) (nonsignatory Nevada professional corporation could not be compelled to arbitrate based on a contract between an associated California professional corporation based on an "alter ego" theory

of the doctrine as applied to corporate shareholders, directors, and officers. The statute says nothing

about other persons' common law alter ego liability. We see no indication in Section 78.747 that it

preempts the common law otherwise.

The Nevada Supreme Court has indicated that it also does not view the statute as preempting

common law applications of alter ego doctrine. In 2008, the court applied the alter ego doctrine to

conclude that one company was not liable for another's obligations.[51] The court held that the

requirements of the alter ego doctrine had not been met and did not suggest that liability was

precluded by Section 78.747.[52]

Nevada common law does not limit alter ego liability to shareholders, officers, and directors.

In *McCleary*, liability was imposed on a successor corporation. The Nevada Supreme Court has also

---

when the record failed to establish the *McCleary* factors); *LFC Mktg. Group, Inc. v. Loomis*, 8 P.3d 841, 845–847 (Nev. 2000) (per curiam) (the alter ego doctrine applied in "reverse" to allow recovery of an individual's debt from the assets of a corporation; substantial evidence supported the trial court's alter ego finding); *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 497–498 (Nev. 1998) (concluding that the "corporate veil must be pierced" because all three elements of the alter ego doctrine were established as a matter of law, and reversing the trial court in relevant part); *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 886–888 (Nev. 1987) (applying *McCleary's* factors in holding a corporate officer was the alter ego of a corporation and reversing the trial court's judgment in relevant part); *Rowland v. Lepire*, 662 P.2d 1332 (Nev. 1983) (citing the *McCleary* factors in explaining that undercapitalization is an important but insufficient factor, in the absence of fraud or injustice, to disregard the corporate entity); *Mosa v. Wilson-Bates Furniture Co.*, 583 P.2d 453 (Nev. 1978) (noting that the court has repeatedly restated the *McCleary* factors and concluding that the record fully supported the trial court's alter ego finding); *Ecklund v. Nev. Wholesale Lumber Co.*, 562 P.2d 479, 479–480 (Nev. 1977) (concluding that claimant failed to establish *McCleary*'s three requirements and reversing the trial court judgment in relevant part); *Carson Meadows, Inc. v. Pease*, 533 P.2d 458 (Nev. 1975) (sufficient evidence was presented to establish a finding of alter ego); *N. Arlington Med. Bldg., Inc., v. Sanchez Constr. Co.*, 471 P.2d 240 (Nev. 1970) (concluding that the *McCleary* elements had not been met and reversing the trial court in relevant part); *Baer v. Amos J. Walker, Inc.*, 452 P.2d 916, 916–917 (Nev. 1969) (holding there was insufficient proof that corporation was non-shareholding manager's alter ego and reversing trial court's finding that the corporation was liable for its manager's debts).

[51] *Truck Ins. Exch.*, 189 P.3d at 660–661 (holding that a Nevada company, wholly owned by an individual that owned half of a related California firm, was not bound by an arbitration clause in plaintiff's agreement with the California company).

[52] *Id.*

held that alter ego liability may be imposed on a corporation for the obligations of an officer who was not a shareholder.[53]

CabelTel was not a EurEnergy shareholder, and thus its alter ego liability for EurEnergy is determined by the common law, not Section 78.747. We need not decide whether Syntek West's alter ego liability is decided by the statute because of its indirect ownership of 20% of EurEnergy's stock. The common law and statutory requirements for alter ego liability are the same under Nevada law. The issue is whether extending EurEnergy's liability to CabelTel and Syntek West is consistent with those requirements.

## C

But before we turn to that issue, we must consider CabelTel and Syntek West's argument that Section 78.747(3) applies to make the determination of alter ego liability a matter of law for the court rather than a matter of fact for the jury. Carlton responds that the mode of trial is a procedural rather than substantive matter and thus governed by the law of the forum.

To resolve this disagreement, we need not begin with abstract and notoriously difficult distinctions between substance and procedure.[54] Generally, "[t]he local law of the forum determines whether an issue shall be tried by the court or by a jury."[55] CabelTel and Syntek West acknowledge

---

[53] *LFC Marketing Group, Inc.*, 8 P.3d at 846–849 (in a post-judgment attachment case involving a network of corporations owned by different family members, the Court concluded that alter ego doctrine could be applied "'in reverse' to reach a corporation's assets to satisfy a controlling individual's debt").

[54] *In re GlobalSantaFe Corp.*, 275 S.W.3d 477, 490 n.54 (2008) ("'Anyone who began studying law after 1940 will have been brought up on two rather intimidating notions about drawing the substance-procedure distinction: it is done differently in different contexts, and in all contexts it is hard to do.'" (quoting David W. Robertson, *Displacement of State Law by Federal Maritime Law*, 26 J. MAR. L. & COM. 325, 348 (1995))).

[55] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 129 (1971).

30

this rule but argue for an exception when the state supplying the controlling substantive law has specified the procedure for adjudicating the issue, as Nevada has here. A state, they argue, can make a decision by a court rather than a jury a substantive right that must be enforced in all jurisdictions applying the state's law. Simply to state the argument is to refute it. The right to a jury constitutionally guaranteed in Texas courts cannot be supplanted by a Nevada statute. CabelTel and Syntek West cite no authority to the contrary in any jurisdiction.

Under Texas law, factual disputes related to the bases for alter ego liability, like factual disputes generally, are for the jury.[56] But once the jury has resolved those disputes, or when the facts are not disputed, whether an imposition of alter ego liability is justified is a matter of law for the court.

**D**

We come finally to the evidence.

CabelTel and Syntek West unquestionably influenced and governed EurEnergy. EurEnergy's general manager, Dave Morgan, was a CabelTel employee, and he reported to Syntek West's general manager, Neil Crouch, who was also EurEnergy's sole officer and director. Through Morgan and Crouch, EurEnergy was governed solely and completely by CabelTel and Syntek West. EurEnergy's interest was their interest. While Syntek West was only a 20% owner of EurEnergy, and CabelTel had no ownership interest in EurEnergy, Phillips owned a controlling interest in EurEnergy's other shareholder, Southmark, and in CabelTel. Phillips chose EurEnergy to contract with CBM, he chose

---

[56] *Castleberry v. Branscum*, 721 S.W.2d 270, 277 (Tex. 1986).

Morgan to run EurEnergy, and he chose Crouch to be EurEnergy's sole officer and director and to oversee all EurEnergy's operations. In sum, EurEnergy, Syntek West, and CabelTel were all inseparable from Phillips, and thus, insofar as EurEnergy's operations were concerned, inseparable from each other.

This, we think, is the material evidence, and it was undisputed. There was other evidence about office-sharing, overlapping use of letterhead and email addresses, and other instances in which CabelTel and Syntek West could have been mistaken for EurEnergy. But that evidence aside, there is simply no disputing that EurEnergy's pursuit of the Bulgarian prospect was Phillips's interest that he chose to pursue using CabelTel and Syntek West.

We are mindful that under Nevada law, "[t]he corporate cloak is not lightly thrown aside."[57] Corporate affiliates do not throw aside that cloak merely because they have common interests and ownership and operate in common cause. Here, however, Phillips used CabelTel and Syntek West through EurEnergy to pursue his interests in Bulgaria. Having determined that this was to benefit himself and the three entities, it would be unjust to require Carlton to treat them otherwise.

Accordingly, we conclude that the evidence not only supports the jury's verdict but establishes CabelTel's and Syntek West's alter ego liability as a matter of law.

---

[57] *Baer v. Amos J. Walker, Inc.*, 452 P.2d 916, 916 (Nev. 1969).

*     *     *

The judgment of the court of appeals is affirmed in part and reversed in part, and the case is remanded to that court for further proceedings consistent with this opinion.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: May 8, 2015