**Opinion issued April 13, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00055-CV

———————————

**AMERICAN MIDSTREAM (ALABAMA INTRASTATE), LLC,
Appellant/Counter-Appellee**

**V.**

**RAINBOW ENERGY MARKETING CORPORATION, Appellee/Counter-
Appellant**

---

**On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 2017-24591**

---

# O P I N I O N

Appellee Rainbow Energy Marketing Corporation (Rainbow) sued appellant

American Midstream (Alabama Intrastate), LCC, (AMID) for breach of contract,

repudiation, fraud, and negligent misrepresentation relating to a natural gas

transportation contract. AMID counter-sued Rainbow for breach of contract. Following a bench trial, the trial court found in favor of Rainbow on its claims, and Rainbow elected to recover on its breach of contract claim. The trial court rendered judgment awarding Rainbow $6,145,215.89 as actual damages, plus pre-judgment interest, costs, and post-judgment interest. In five issues, AMID contends that (1) the evidence was insufficient to support the trial court's findings on Rainbow's tort claims; (2) the evidence was insufficient to support the trial court's findings on Rainbow's breach of contract and repudiation claims; (3) even if the trial court's liability findings stand, Rainbow's damages are unrecoverable; (4) AMID is entitled to recover on its own counterclaim for breach of contract against Rainbow; and (5) in the alternative, AMID is entitled to have the case remanded for a new trial. Rainbow contends, in its sole issue, that the trial court erred in denying its request for attorney's fees.

We conclude that the evidence was sufficient to support the trial court's findings on the breach of contract claim, and therefore do not address the remaining tort claims. We further conclude that the evidence was sufficient to support the trial court's award of damages, and we conclude that the trial court did not err in denying Rainbow's claim for attorney's fees.

Accordingly, we affirm.

2

**Background**

This lawsuit arises out of a contract between Rainbow—a natural gas trading company—and AMID—a natural gas transportation company that owns the Magnolia pipeline. The parties refer to this contract as the MAG-0005. Effective March 1, 2015, AMID agreed to provide firm balancing services and transportation of certain quantities of natural gas to Rainbow. In return, Rainbow agreed to pay a demand charge or "firm transportation rate" of more than $1 million per year, regardless of the services it actually used. As the trial court found here, "In the natural gas industry, pipelines offer service that is either firm or interruptible. A pipeline can curtail or decline to provide firm service only if specifically authorized by the contract. A pipeline can curtail or decline to provide interruptible service for any reason."[1]

AMID, however, faced difficulties in performing under the MAG-0005. Its relationship with the connecting Transco pipeline complicated its performance, and on several occasions between January 2016 and January 2017, AMID limited or curtailed Rainbow's use of the balancing services provided for by the MAG-0005.

---

[1] *See also* "Natural gas power plants purchase fuel using different types of contracts," U.S. Energy Information Admin., https://www.eia.gov/todayinenergy/detail.php?id=35112 (Feb. 27, 2018, last visited March 29, 2023) (stating that "firm" contracts provide agreed-upon capacity at higher priority for transport and "cannot be curtailed . . . except under unforeseeable circumstances," while "interruptible" contracts are lower-priority and may be stopped or curtailed if firm contract holders use all available capacity or for other reasons).

3

Rainbow nevertheless continued paying the demand charges. Rainbow had negotiated the MAG-0005 as a firm contract so that it could increase the amount of gas it could supply to its customers. It needed to know that AMID's performance under the MAG-0005 would be reliable so that Rainbow, in turn, could be sure to have the gas supply and transportation capacity to meet its own obligations to its customers. Rainbow worked with AMID to determine if the difficulties with the MAG-0005 could be resolved.

Ultimately, in December 2016, AMID informed Rainbow that it would no longer be able to use the full capacity provided for in the MAG-0005 over consecutive days, that the contract would be treated as interruptible rather than firm, and that AMID had to limit service to Rainbow to "stay under the radar" with Transco. On February 1, 2017, Rainbow sent written notice to AMID terminating the MAG-0005.

In April 2017, Rainbow sued AMID, asserting that AMID breached the MAG-0005. Rainbow also alleged causes of action for fraud, fraudulent inducement, and negligent misrepresentation based on AMID's knowing or reckless representations that it had sufficient capacity in its pipeline to guarantee 20,000 MMBtu of gas per day in balancing services and representing that Rainbow's right to use AMID's system would be "firm," when, in fact, it could not perform. AMID filed a counterclaim alleging that Rainbow breached the MAG-

4

0005 by failing to pay the transportation rate, also referred to as a demand charge, and by failing to comply with other billing and payment terms and that Rainbow wrongfully terminated the contract.

The trial court conducted a bench trial on Rainbow's claims for breach of contract, repudiation, fraud and negligent misrepresentation as well as AMID's counterclaim for wrongful termination of the contract. The testimony, documents, and other evidence was voluminous.

## A.    Rainbow Trades Natural Gas

Rainbow's president Stacy Tschider testified regarding Rainbow's general business model, putting into context the MAG-0005 and its negotiation, performance by the parties, and consequences of its breach. Rainbow is a natural gas trading company in the business of supplying customers with natural gas since 1994. Rainbow's business model included a strategy of making "forward sales," or commitments to provide a particular quantity of gas at a specified location and date in the future, especially during the winter months. These contracts were typically negotiated and signed during the summer months. Rainbow would then enter other agreements to purchase gas at various locations to satisfy the sales contracts, including making "baseload" purchases—purchases scheduled in advance—plus daily trades and buys.

In addition to its purchase of the gas itself, Rainbow also entered contracts for transportation rights to move the purchased gas to its customers. Transportation of natural gas involves the receipt of the gas by the company providing the transportation, the movement of gas through the transporter's pipeline system, and the delivery of gas by the transporter for the shipper's account. Rainbow entered both "firm" and "interruptible" transportation contracts with various pipelines. Rainbow also used contacts in the industry to purchase "recallable" excess capacity, which is excess capacity that shippers were frequently required by industry regulations to have available (and thus might need to "recall" or put back into use) but would not actually need to use on any given day.

To facilitate these transportation transactions, a shipper like Rainbow would make a "nomination," or a request for service under a specific contract, indicating the specific date, quantities, and receipt and delivery locations. Rainbow typically made these nominations to transport gas from one location to another in pairs. It would make a nomination for the point where gas entered a particular pipeline and another for where it exits. Nominations are subsequently "confirmed" by the transporter. For the most part, pipelines keep nominations into and out of their system in balance to maintain the proper operational pressure on the pipeline. Transportation services thus can include both storage services and balancing services, which essentially allow a customer to either "pull" gas that it will owe

back to the pipeline or "park" gas that the pipeline will owe back the customer at a future time so that the customer can balance gas supply with actual demand.

Tschider testified that Rainbow has "contracts with hundreds of companies throughout the United States" and other parts of North America. He stated that "reliability" was the most important concern in meeting customers' needs, and Rainbow's extensive business network helped the company have "the tools in place to be able to facilitate [its] transactions." Rainbow does business with over one-hundred companies and utilities, and, over the years, Rainbow has entered hundreds of contracts with companies like Duke Energy and Shell.

Tschider explained that Rainbow had entered thousands of forward sales contracts as both a buyer and a seller, depending on the circumstances. Tschider stated that this type of contract allowed the company to understand in advance the cost of the purchase, the cost for transportation, and the price at which to sell the gas to make a profit. Forward sales contracts allowed "supply certainty," which helped Rainbow provide reliability to its business partners and customers. Tschider further testified that Rainbow preferred to use firm, as opposed to interruptible, contracts. Thus, it engaged in what he called "back-to-back transactions," meaning that "[Rainbow has] very, very little risk associated with that transaction. Everything is matched. I'm buying firm, I'm transporting firm, and I'm selling firm." Tschider testified that Rainbow did this type of deal "all the time."

**B. AMID Owns the Magnolia Pipeline**

AMID is one of the transportation companies that Rainbow used to transport natural gas to its customers. Formed in 2009, AMID owns, operates, and develops numerous midstream energy assets, including natural gas pipelines, gathering systems, processing plants, and storage facilities. One of the pipelines owned by AMID is the Magnolia pipeline, a small natural gas pipeline located in Alabama that connects to the larger Transco pipeline. The Transco pipeline connects Texas to Pennsylvania and is divided into zones. Because of its location, the Magnolia pipeline has strategic significance in moving natural gas into colder northern states. There is a constraint point, where gas transportation bottlenecks in times of peak demand, at station 85 of the Transco pipeline, just west of the Magnolia-Transco Interconnect. The Magnolia also serves to connect other pipeline systems, such as the Tennessee Gas pipeline and the Southcross pipeline, to the Transco pipeline.

Numerous parties, regulations, and agreements govern interactions between AMID's Magnolia pipeline and the Transco pipeline. The Federal Energy Regulatory Commission (FERC) regulates, among other things, interstate transmission of natural gas. As part of its oversight, FERC requires natural gas companies to file tariffs, or compilations of all the effective rate schedules and copies of each form or service agreement. *See, e.g.*, 18 C.F.R. § 154.2(b) (defining "FERC Gas Tariff"). The rate schedule in the tariffs includes "a statement of a rate

or charge for a particular classification of transportation or sale of natural gas" subject to FERC's jurisdiction and "all terms, conditions, classifications, practices, rules, and regulations affecting such rate or charge." *Id.* § 154.2(e). In addition to the regulations provided by federal and state entities, interactions between the Magnolia and the Transco are subject to the terms of private agreements like the Operational Balancing Agreement (OBA) between AMID and The Williams Companies, the owner of the Transco pipeline.

## C.     Rainbow Contracted with AMID for Transportation Services

Rainbow originally became interested in using the Magnolia pipeline to transport gas from the Tennessee pipeline to the Southcross pipeline, and then to the Magnolia and on to Rainbow's ultimate customers. AMID and Rainbow entered into their first agreement for Rainbow to transport natural gas on AMID's Magnolia pipeline in 2014 and renewed through 2018, including while this underlying litigation was on-going. This contract, the MAG-0001, provided for firm transportation of 25,000 MMBtus of natural gas to be moved though the Magnolia pipeline system.

Rainbow realized that its current customers had even more demand than it could supply using the MAG-0001. Because of the potential for backlog or constriction on the Transco at station 85, near the Mississippi-Alabama border, and the possibility of acquiring cheaper gas in the part of the south that falls within

9

Transco's "Zone 4" and entering into additional forward sale contracts with customers in colder locales along the east coast in "Zone 5," Rainbow became interested in an additional contract with AMID to provide balancing services. Tschider and other Rainbow representatives testified that obtaining additional capacity and balancing services would allow Rainbow additional flexibility to enter into more forward sales contracts with customers along the Transco pipeline.

## D.     Rainbow and AMID Executed the MAG-0005

To obtain this additional flexibility that would result from a balancing agreement with AMID, Tim Moreino with Rainbow negotiated with George Matthews from AMID what the parties' referred to in emails as an "FT [Firm Transportation] Balancing Agreement." Matthews emailed Rainbow with the summation of their negotiations, writing that the agreement included a provision to "[l]imit the number of days going short to Transco in the beginning of the month to no more than 4 days at 20,000/day," and that the "[m]aximum long/short on any given day is 20,000 MMBtu." Matthews further stated that, "if Transco ever says nominations and physical flow don't match and they need to, parties [must] take corrective action to make them match." He likewise agreed that "the agreement is FT [Firm Transportation] but if our hand is forced it can be curtailed."

AMID and Rainbow formalized this agreement and executed the MAG-0005 in 2015. The MAG-0005 provided that Rainbow could "transport" up to 20,000

MMBtu of natural gas each day on the Magnolia pipeline. The MAG-0005 identified the Magnolia-Transco Interconnect as both the primary receipt point and the delivery point.

Significantly, the MAG-0005 relieved Rainbow of the obligation to balance its receipts and deliveries on a daily basis under certain circumstances, thus providing what the parties described as "balancing services" or "park and loan" services. This meant that, subject to some limitations, Rainbow could make a daily delivery nomination of up to 20,000 MMBtu without a corresponding receipt nomination, and vice-versa, as long as all of its deliveries and receipts reconciled or balanced at the end of the month.

The dispute between Rainbow and AMID focused on these balancing services. Section 9.1 of the MAG-0005 provided relevant details:

> Receipts and Deliveries of Gas. Except as otherwise provided for herein, for the purposes of Section 8 of the SOC,[2] Shipper [Rainbow] shall not be obligated to balance receipts and deliveries of gas on a daily basis unless, on or for any Day, either Transporter [AMID] or Shipper is requested or required by an upstream or downstream party to balance receipts and deliveries of gas attributable to Shipper. If Transporter is requested or required by an upstream or downstream party to balance receipts or deliveries of gas that are attributable to Shipper, Transporter may cease receiving gas from or delivering gas to or for Shipper until the upstream or downstream party no longer

---

[2] "SOC" referred to the statement of terms and conditions incorporated by reference for firm transportation on AMID's system. FERC requires that these terms be filed with it. The SOC, among other things, specifies the priority for how AMID will curtail service if necessary—"make up gas" first, the interruptible service, then firm service.

requests or requires Transporter to balance receipts and deliveries of Shipper's gas.

Section 9.2 provided that any imbalances would be corrected on a monthly basis:

Monthly Balancing. Notwithstanding Section 9.1, Shipper will use its best commercial efforts to balance receipts and deliveries of gas on a monthly basis so that, at the end of any Month, Shipper has no gas imbalances on Transporter's System.

Section 9.3 further limited Rainbow's nominations "during the first ten (10) Days of a Month to no more than four (4) consecutive days during which, on any Day, [Rainbow] has nominated receipts of gas into [AMID's] system without nominating Equivalent Quantities of gas out of [AMID's] system."

In return for Rainbow's right to nominate up to 20,000 MMBtu of gas on AMID's Magnolia pipeline each day, Rainbow agreed to pay a "demand rate" of $.014 per MMBtu of natural gas allowed under the contract regardless of the amount of capacity it actually used. This translates to $2,800 per day or $1,022,000 per year.

The MAG-0005's effective date was March 1, 2015. Tschider testified that, prior to entering into new forward sales contracts that would rely, in part, on the MAG-0005, Rainbow wanted to be sure that AMID would perform reliably. Tschider stated that Rainbow did not want to enter into forward sales contracts with customers without verifying that it would be able to meet demand because Rainbow would otherwise be exposed to financial and reputational losses.

Rainbow's expert, William Coorsh, likewise testified that, in terms of Rainbow's overall business strategy, the MAG-0005 contract was intended to serve as a sort of "insurance policy," providing additional options for increasing its supply to its customers, particularly on days of high demand. Coorsh stated that the MAG-0005 could only be useful if AMID's performance was reliable because the "ultimate risk" in entering into forward sales is "the inability to perform." Thus, Rainbow needed to address the issue of supply certainty.

Rainbow began to use the MAG-0005 to make daily trades, rather than immediately expanding its forward sales commitments. However, during the first winter that the MAG-0005 was in effect, AMID limited service to Rainbow under the contract.

On January 8, 2016, AMID advised Rainbow to limit imbalances more strictly than was required by the terms of the MAG-0005. AMID limited Rainbow's nomination for January 11, 2016, telling it not to pull more than 1319 MMBtu of gas on January 11 because an Operational Flow Order (OFO) from Transco was in effect. AMID later advised Rainbow that the OFO did not affect Rainbow's ability to use the MAG-0005, but because of the timing of these communications, Rainbow lost the opportunity to use the MAG-0005 to support its daily trades. Rainbow nominated only 1,116 MMBtu of gas for January 11. AMID confirmed that reduced nomination in full.

On January 22, 2016, AMID again told Rainbow it could not use the MAG-0005 to pull any gas on January 23 and 24. Rainbow was otherwise able to use the MAG-0005 and made 17 more out-of-balance nominations in January 2016, which were confirmed in full by AMID.

**E.     AMID is Subject to an Operational Balancing Agreement with Transco**

AMID argued that, beginning in January 2016, its performance under the MAG-0005 was impacted by its relationship with Transco. Interactions between the Magnolia pipeline and the Transco pipeline are subject to an Operational Balancing Agreement (OBA), in which the parties agreed to specific procedures for balancing between nominated (or scheduled) levels of service and actual quantities moving through the Transco pipeline from the identified delivery and receipt points. The OBA obligates AMID, as the OBA party, to resolve imbalances created at the Magnolia-Transco interconnect. These imbalances arise due to differences in quantities of natural gas scheduled through the interconnect and the gas actually measured as delivered at the interconnect.

Relevant here, the OBA provides:

> The Parties intend that the quantity of gas actually delivered and received each day at each Location will equal the Scheduled Quantities for that Location. All Scheduled Quantities at each Location will be deemed to have been received and/or delivered under the applicable shipper agreements. Any imbalance created, when the actual physical flow is different than the Scheduled Quantities, will be the "Operational Imbalance," which will be the responsibility of the Parties to eliminate pursuant to this Agreement.

There is only one "Location" identified in the OBA—the Transco-Magnolia Interconnect. The OBA further provided that "Operational Imbalances shall be resolved" pursuant to the provisions of the Transco's FERC Gas Tariff, "provided that the final resolution of the OBA Imbalance shall be determined pursuant to Exhibit 2 hereto."

Section 16(b) of the OBA provides that Transco could limit imbalances at the Magnolia-Transco interconnect if (1) imbalances exceeded 5% of total nominations at the interconnect and (2) those imbalances created operational concerns. Exhibit 2 contained specific provisions for resolving operational imbalances depending upon whether the operational imbalance was within or exceeded the 5% cumulative limit.

Transco's FERC Gas Tariff, specifying the general rules and rates for service, provided that, because the interconnect of the Transco and Magnolia pipelines was subject to an OBA, that document governed the transactions between the two pipelines. The tariff further provides that Transco can issue Operational Flow Orders, or OFOs. An OFO is a notice issued by the pipeline requiring shippers to balance their gas supply with their customers' usage or risk incurring noncompliance charges. OFOs help a pipeline protect the operational integrity of the pipeline by restricting service or requiring affirmative action by the shipper to address imbalances or other operational concerns. Transco's FERC tariff provides:

In order to alleviate operating conditions which may threaten the integrity of [Transco's] pipeline system, it may be necessary for [Transco] to issue Operational Flow Orders (OFOs) to effectuate adjustments in Buyer's daily receipts or deliveries over a reasonable period of time to maintain a current or cumulative balance between Buyer's receipts and deliveries in accordance with the terms of Seller's transportation rate schedules (Imbalance OFO), or to ensure that gas quantities are received and delivered by Buyer where scheduled (Scheduling OFO). Before issuing an OFO, Seller will attempt to remedy those operating conditions through requests for voluntary action provided, however, exigent circumstances may exist which require immediate issuance of an OFO.

AMID presented evidence that, starting in January 2016, Transco began policing imbalances at the Magnolia-Transco interconnect more strictly than it had been in previous years. AMID showed that the number of OFOs issued by Transco increased after it executed the MAG-0005, from four OFOs in the last half of 2015 to twenty in 2017. These OFOs, which AMID introduced into evidence at trial, were "Imbalance OFOs." The OFOs also had a line for designating whether "OBA parties"—parties like AMID, which had an OBA with Transco—were subject to a particular OFO. All of the OFOs introduced into evidence stated that OBA parties like AMID were not subject to the OFO. Furthermore, neither AMID nor Rainbow was named in any of the OFOs or otherwise directed to take action.

Additionally, Rainbow had its own agreement with Transco—a pooling agreement that required Rainbow to balance its receipts and deliveries on Transco.

**F.      Rainbow and AMID Performed Under the MAG-0005**

Based on the two refusals of service by AMID on January 8 and January 22, 2016, Rainbow decided not to enter into any monthly contracts for February or March 2016. It continued to use the MAG-0005 to support daily trades while the parties worked out the details of performing under the MAG-0005 in light of AMID's obligations under its OBA with Transco.

On February 11, 2016, despite having previously confirmed a nomination to pull gas using the MAG-0005, AMID curtailed one of Rainbow's nominations, cutting Rainbow's nomination to zero. AMID presented evidence that Transco again had an OFO in place, but that flow order stated that parties with an OBA in place, parties like AMID, were not subject to the order. AMID also presented evidence that the Southcross pipeline was experiencing issues. Rainbow presented evidence that, following this February 11 curtailment, it lost money because it had to purchase gas at significantly higher prices to satisfy its obligations to its customers for that day.

This difficulty prompted Tim Moreino with Rainbow to discuss the situation with George Matthews, AMID's director of producer services who had negotiated the MAG-0005 on AMID's behalf. In a phone call on February 18, 2016, Matthews acknowledged that AMID had "screwed up" by curtailing Rainbow's February 11 nomination, but he stated that AMID hoped to improve its

performance going forward. Moreino asked whether AMID had set up a formal "park and loan" rate with FERC, and Matthews said no. Matthews explained, "[W]e do these kind of things like we do with you guys on the balancing deal . . . as buy/sells, typically. But we also refer to them oftentimes internally as park and loans. Even though that's not really what they are." Matthews stated that, rather than a formal park and loan service, AMID intended to meet its balancing obligations to Rainbow by "swinging and balancing on OBAs."

Moreino pointed out the problems with AMID's curtailment of its nomination and asked Matthews about the future of the balancing agreement now that Transco was "paying more attention to the flows and the OBAs." Matthews responded that AMID cut Rainbow's nomination after they tried to reduce other ways but were "still out of whack and [Transco] pushed," resulting in AMID curtailing the entirety of Rainbow's nomination that day. Matthews told Moreino that this was done because "[w]e don't want the attention, we don't want the scrutiny [from Transco]." Matthews told Moreino that Transco "effectively threatened . . . to put an OFO in for our point [and] we don't want that." Ultimately, Matthews indicated that "everything is fine" and that the curtailment in February "was an anomaly." Matthews stated that AMID was working toward building better relationships with the people at Transco.

Tschider likewise testified that, following the problems in the winter of 2016, his team from Rainbow met with Matthews from AMID. Similar to Moreino's testimony, Tschider testified that Rainbow told AMID, "You guys are treating this as an interruptible contract and that's not what we signed up for. The contract is a forward balancing contract." According to Tschider, Matthews informed Rainbow that AMID would "correct this" and "make it right." Matthews also testified that AMID always intended to provide the services it committed to in the MAG-0005 "[t]hrough a combination of history, historical imbalances that [AMID] had successfully run across the Transco interconnect and through the OBA." Matthews agreed that AMID could have satisfied its obligations to Rainbow through other methods like buying or selling additional gas from third parties, but AMID never considered doing so.

Messages exchanged between schedulers at AMID and Rainbow indicated that the parties continued interacting and that Rainbow made nominations under the MAG-0005 through the summer of 2016. Rainbow did not always use its full 20,000 MMBtu capacity, consistent with Rainbow's intention to use the MAG-0005 as an "insurance policy" or additional tool to secure the supply needed for its customers.

Nevertheless, Rainbow identified eight occasions on which AMID's scheduler, Ed Formell, told Rainbow its full 20,000 MMBtu was not available. For

19

example, on May 13, 2016, Rainbow's scheduler asked AMID, "[F]or the weekend can we put in 15k / day from Transco[?]" Formell responded, "No, 10 is about the max I can take into me right now." Tschider testified that, because Rainbow was not able to use the full 20,000 MMBtu reliably through the summer of 2016, Rainbow could not commit to the additional forward sales contracts that it had anticipated when executing the MAG-0005. Rainbow used the MAG-0005 to support daily trade only.

In the fall of 2016, AMID again told Rainbow to limit imbalances on three occasions: (1) on November 22, 2016, AMID notified Rainbow that balancing services available were limited to 15,000 MMBtu; (2) on December 6, 2016, Transco issued a critical operations alert, and AMID notified Rainbow that its nomination could be no more than 3,000 MMBtu out of balance, resulting in Rainbow making no nomination at all for December 7, 2016; and (3) on December 15, 2016, when Transco issued an OFO and AMID notified Rainbow that it could use only 10,000 MMBtu of balancing services, resulting in Rainbow submitting a nomination for 3,466 MMBtu of out-of-balance capacity the next day, which AMID confirmed in full. Rainbow submitted 29 other out-of-balance nominations that winter, all of which were confirmed in full.

To address the ongoing concerns regarding AMID's inconsistent performance, Rainbow arranged another phone call on December 7, 2016, for the

parties to discuss the effect of Transco's ongoing restrictions on their continued performance under the MAG-0005. During this call, AMID's Patricia De La Rosa, who supervised scheduling on the Magnolia pipeline, stated that Transco "started to call [AMID] out" more frequently and that AMID "would like to keep our imbalance under the radar with Transco, as much as possible." She expressed a belief that AMID "still had some flexibility" under the terms of its OBA with Transco, but that "[t]he quantity on any given day is what's going to really be a bit more, you know, stringent." Formell further stated, "To be honest, . . . 20,000 probably isn't going to be the number anymore." De La Rosa stated during this phone call that the MAG-0005 was interruptible, rather than firm, and that Rainbow could not use the full Maximum Daily Quantity identified in the MAG-0005 on three consecutive days.

Rainbow continued to negotiate with AMID regarding the performance according to the terms of the MAG-0005, identifying its concern as being that its scheduler "has not been able to utilize all 20,000dth on called days, the volume has been 10,000dth."[3] A series of communications indicated that the parties were attempting to agree to some amendments that would allow the parties to continue performing. Rainbow made its last nominations in January 2017 while these negotiations were ongoing.

---

[3]  MMBtu is roughly equivalent to a decatherm (dth), and both are used interchangeably by the parties as measure of units of natural gas.

No resolution occurred, however, and on February 1, 2017, Rainbow Energy sent notice to AMID that it was terminating the MAG-0005. It ceased making its monthly demand payments and did not make any additional nominations under the MAG-0005.

## G. Rainbow Presented its Damages Model

In addition to the above evidence relevant to its breach of contract and fraud claims, Rainbow presented evidence of the damages it sustained because of AMID's unreliable performance under the MAG-0005. Rainbow supported its damages evidence with testimony from Stacy Tschider, damages expert William Coorsh, and Rainbow employee Richard Phelan, among other evidence.

Rainbow asserted that, but for AMID's failure to treat the MAG-0005 as a firm contract, it would have used the MAG-0005 as a tool to make additional sales to its customers. Thus, AMID's failure to perform resulted in lost profits to Rainbow. Specifically, Rainbow presented evidence that, if AMID had performed reliably, as if the MAG-0005 were firm, it would have made larger daily trades in January 2016 and then would have entered into larger or additional forward sales contracts to its already-existing customers. It would have used the MAG-0005 for the term of the contract as a source of gas on days of high pricing.

Both Tschider and Coorsh testified that Rainbow agreed to the terms of the MAG-0005, including the demand charges of $2,800 per day regardless of

22

Rainbow's actual usage, because it would provide Rainbow with the capacity to reliably enter additional or larger forward sales contract with Rainbow's established customers. Coorsh in particular testified that the value of the MAG-0005 was as an "insurance policy"—firm capacity that Rainbow would have available when needed to meet obligations to its customers—rather than for daily use. Coorsh stated that "the more conservative approach to take" with a firm contract like the MAG-0005 was to enter into forward-sales contracts to sell the gas, rather than using it for daily trades, because "the cash flow is certain, the volumes to be delivered are certain." Coorsh testified that the certainty of supply at the Magnolia-Transco interconnect provided for in the MAG-0005 should have given Rainbow the additional tools it needed to increase its forward sales.

Tschider, Coorsh, and Phelan all testified that reliability of performance was the key feature that both Rainbow and its customers relied upon. If AMID did not perform reliably, Rainbow could not enter into forward sales contracts by depending on the supply that the MAG-0005 was intended to provide. Coorsh testified that a contract that was negotiated to be firm but was treated as interruptible presented a very risky situation in which Rainbow would be exposed to the inability to deliver the agreed-upon quantities of gas to its own customers, which put it at risk for financial losses and reputational damage.

Thus, Coorsh and others testified that Rainbow's damages resulted, not from any one day on which AMID failed to provide service, but from AMID's failure to treat the MAG-0005 as a firm contract. Coorsh stated that the commercial effect of AMID's curtailment of Rainbow's nominations was "devastating" because "[i]t shows doubt." The problems that could arise for Rainbow if AMID failed to perform after Rainbow had already entered into firm, forward sales agreements included "reputation damage, financial consequences, in an extremely high-priced environment, perhaps financial bankruptcy." Coorsh stated, "[I]f there is doubt, the whole strategy falls apart."

Coorsh testified that it was reasonable for Rainbow to look to the totality of AMID's performance, or lack thereof, under the MAG-0005 in determining its damages. He stated that a company like Rainbow would not make major decisions about contracts and business strategies focusing "on just one thing." It would, instead, focus on its knowledge of the marketplace and its customers, where and how it would supply gas to those customers and "a multitude of other things." He stated, "To isolate it to particular days and say that this is what the damages are under the totality of the contract just isn't right. The totality of the damages are based on what [Rainbow] could have done over the entire term."

Coorsh and Tschider both testified that AMID's breaches destroyed the benefit of the bargain in its entirety. Rainbow already had the MAG-0001 for

24

transportation services, and it entered into the MAG-0005 balancing agreement so that it could increase the reliability of its supply so that it could increase its forward sales. If Rainbow could not get the firm service at the quantity agreed to, then it could not get the benefit of the MAG-0005.

The damages model presented by Rainbow set out in detail the sales that Rainbow would have made if it could have used the MAG-0005 as negotiated. The figures for quantities of gas sold and for the anticipated revenue and costs were based on real transactions for revenue, business with its current customers, and representations for potential business that it lost as a benefit of the bargain due to AMID's breach of the MAG-0005. It used publicly-reported index prices to establish the prices of gas and other costs during the months for which it claimed lost profits, spanning over the winter months from 2016 to 2018.

Coorsh explained that Rainbow's damages model determined the lost revenue components using "actual forward transactions that were executed by Rainbow" in conjunction with the MAG-0001 contract. Coorsh testified that, despite the forward sales executed based on the MAG-0001, Rainbow "had more demand from buyers than [it] could satisfy" and it "very clearly . . . had the ability to enter into other forward sales" at the same average price as the actually executed sales under the MAG-0001. Phelan likewise testified about Rainbow's business involvement with companies like Macquarie Energy LLC, Shell Energy North

America, and Duke Energy. Phelan testified, for example, that when Rainbow negotiated its contracts between November 2016 and March 2017, Duke was looking for quantities between 10,000 and 20,000, but Rainbow only had the firm capacity to guarantee 7,500. Duke "needed to lock in their winter supply during the summer," so Duke agreed to the reduced amount with Rainbow and looked to other suppliers to meet its remaining gas supply needs for "[t]heir power plant [in] Transco Zone 5." Tschider also testified regarding additional demand that Rainbow could have met using forward sales.

Using the month of November 2016 as an example, Coorsh explained the details of Rainbow's damages model. He testified that the average forward sales price "in conjunction with sales associated with the MAG-0001 was approximately $1.416, maybe $1.42, something like that. And in the model, they conservatively used $1.40 [as the average value for the sales that were lost under the MAG-0005]." Coorsh further explained the method used for determining the cost side of the model. He stated that the index prices that were used on the cost side of the model came from "Platts Gas Daily prices" that reflected the actual transactional prices in contracts that Rainbow would have been able to enter into with counterparties to buy gas to supply to its customers. Coorsh testified that "[t]he publisher [of the Platts Gas Daily] surveys the market. They have transparency into the market and they survey deals that are done at fixed prices and subsequently

publish their index." The model calculated the cost that Rainbow would have incurred to satisfy its forward contracts by determining what Rainbow would have paid in the daily market. Other related expenses, such as fuel, usage, and transport costs were based on established measures such as Transco's tariff or actual deals that Rainbow had been able to execute using other assets like the MAG-0001. Rainbow then determined the expected profits by subtracting the costs from the revenues.

Coorsh testified that the damages model was "conservative" in selecting the rates it used to calculate expected revenue and costs. The model was also conservative in that it sought lost profits only for the winter months (January-March and November-December of 2016 and 2017, and January through March of 2018). Coorsh further testified that the model "takes into account what I would call mitigated damages, what actually happened. And secondly, it takes into account the demand charge that was due to Magnolia." The damages model accounted for the profits that Rainbow was able to realize using the MAG-0005 to make daily trades. The damages model thus included Rainbow's actual revenues based on, in Coorsh's words, "making the best of a bad situation."

Phelan also testified that Rainbow accounted for the demand charges as part of its costs. Phelan stated that Rainbow was not seeking return of the demand charges paid in 2015. Instead, Rainbow took the demand charges "post the breach

all the way to the last payment that [Rainbow] made" and included that expense in the damages model "showing what [Rainbow] would have actually paid for that product had we had it." Then, in determining the total damages, Rainbow included a "credit for demand charges paid post-breach" of $996,800. The total damages provided for in Rainbow's damages model were $6,686,143.79.

## H.    Trial Court Found in Favor of Rainbow and Signed the Final Judgment

The trial court found that the MAG-005 "concerns firm balancing services AMID would provide to Rainbow on AMID's Magnolia System." The trial court outlined the material terms:

(a) AMID would provide Rainbow with a firm balancing service of up to 20,000 MMBtu/day—meaning Rainbow could make a delivery nomination of up to 20,000 MMBtu each day without a corresponding receipt nomination and vice-versa, allowing Rainbow to "pull" gas (have gas deemed delivered into Transco at the Magnolia-Transco Interconnect) or "park" gas (have gas deemed delivered into Magnolia at the Magnolia-Transco Interconnect);

(b) Rainbow was required to balance receipts and deliveries only on a monthly basis;

(c) Rainbow could not use the MAG-0005 to park gas or pull gas on four consecutive days in the first ten days of each month;

(d) Rainbow could not use the MAG-0005 in such a way that it created an imbalance between receipts and deliveries on Transco (or Southcross) and Transco (or Southcross) requested or required Rainbow and/or AMID to not create such an imbalance;

(e) AMID was excused from performing if Transco (or Southcross) requested or required AMID to balance physical flow and scheduled

28

receipts or deliveries at the Magnolia-Transco (or Southcross-Magnolia) Interconnect; and

(f) Rainbow was required to pay demand charges to AMID in the amount of $2,800/day.

The trial court further found that as a result of the December 7, 2016 conference call—during which Patricia De La Rosa, AMID's scheduling supervisor, told Rainbow that it could not pull 20,000 MMBtu over three consecutive days, that the MAG-0005 was interruptible, and that AMID needed to limit service to Rainbow in order to "stay under the radar" with Transco—Rainbow "could not reasonably rely upon the MAG-0005 as a reliable source of natural gas." Rainbow informed AMID on December 21, 2016, via email between Tim Moreino and George Matthews, that AMID had failed to provide the promised 20,000 MMBtu of gas, in breach of the MAG-0005. Rainbow ceased performance after January 13, 2017, and on February 1, 2017, Rainbow sent AMID a letter terminating the MAG-0005. The trial court concluded that De La Rosa's statements on December 7 constituted a repudiation by AMID that Rainbow accepted "by providing notice of default on December 21, 2016, ceasing service after January 13, 2017, and terminating the MAG-0005 on February 1, 2017."

Relevant to damages, the trial court found that "[i]t was foreseeable to AMID that Rainbow would use the MAG-0005 to supply forward contracts with its customers after Rainbow was able to confirm the reliability of the MAG-0005"

and that "Rainbow would not be able to use the MAG-0005 to supply forward contracts if it was not reliable on days that Rainbow tested the MAG-0005." The trial court concluded that "AMID's refusals to provide service constituted a material breach of MAG-0005 and effectively made the firm balance service interruptible, destroying the benefit of the bargain for Rainbow." The trial court further concluded that "AMID's material breach proximately and foreseeably damaged Rainbow by making it impossible for Rainbow to reliably enter into forward sales with customers—under which Rainbow would have earned profits." The trial court concluded that "Rainbow mitigated its damages by not entering into forward sales contract with its customers using MAG-0005" because Rainbow "would have suffered lost profits, cover costs, and reputational damage" had it entered into contracts and AMID failed to perform. "Rainbow also mitigated its damages by entering into daily trades using balancing services provided by MAG-0005 on days that it was able to confirm that balancing services were available."

The trial court found that Rainbow's damages model accurately accounted for all costs and net profits that Rainbow would have realized had AMID performed. It concluded, "Rainbow's damages, as reflected in the Damages Model were a natural, probable, and foreseeable result of AMID's breach and of AMID's fraud. Such damages were foreseeable to AMID at the time the parties entered MAG-0005 as the probable, natural result of its breach."

30

Rainbow moved for entry of judgment, and AMID sought amended and additional findings of fact and conclusions of law. These motions were heard by the trial court on August 23, 2019. Regarding construing the MAG-0005, the trial court stated: "I considered your experts. I considered the OBA. I considered the FERC tariff. I considered all of these things that sort of created the foundation for which MAG-0005 was entered."

After this hearing, the trial court signed an amended conclusion of law that set forth its interpretation of MAG-0005 Section 9.1. In its amended findings and conclusions, the trial court stated,

> In construing Section 9.1, the Court considered the entirety of the MAG-0005 Agreement and objective evidence of the surrounding facts and circumstances (including the OBA and Transco's FERC tariff) as an aid in the construction of the MAG-0005, and determined that this was the only reasonable interpretation of Section 9.1. The Court considered evidence of industry custom and usage, which was supportive of the unambiguous meaning of the MAG-005, but did not add to, delete from, or change the plain text of the MAG-0005 based on such evidence.

The trial court also provided additional clarification regarding attorney's fees, stating that it would not award them to Rainbow because of AMID's status as a limited liability company .

The trial court rendered its Modified Final Judgment on November 22, 2019. It awarded Rainbow $6,145,215.89 in "actual benefit-of-the-bargain damages for Rainbow's lost profits," $449,097.42 in prejudgment interest, plus costs and post-

31

judgment interest. The trial court further ordered that AMID take nothing on its counterclaim for breach of contract.

## Standard of Review

In its first two issues, AMID argues that the evidence is insufficient to support the trial court's judgment. In an appeal from a bench trial, we review legal-sufficiency challenges to the trial court's findings of fact under the same standards that are applied to review the evidence supporting a jury's verdict. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Where, as here, the trial court issued findings of fact and conclusions of law, the trial court's findings of fact have the same weight as a jury verdict. *Merry Homes, Inc. v. Luu*, 312 S.W.3d 938, 943 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

An appellant who attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof must demonstrate on appeal that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas, Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We consider the evidence in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will sustain a no-evidence challenge if the record shows: (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of

law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence in the record in a neutral light and set aside the fact findings only if it they so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When an appellant challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See id.*; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

We are mindful that the trial court, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). The trial court may choose to believe one witness and disbelieve another. *See City of Keller*, 168 S.W.3d at 819. It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder. *McKeehan*, 554 S.W.3d at 698.

## Breach of Contract

In its second issue, AMID contends that Rainbow's breach of contract and repudiation claim fails as a matter of law. AMID argues that, if the parties' MAG-0005 contract is applied as written, there is legally and factually insufficient evidence that AMID breached or repudiated the contract. AMID also argues that it was excused from performing after Rainbow elected to continue the contract despite the purported breaches, but then changed its mind, terminated the contract, and ceased its monthly payments.

### A.    Relevant Law

In construing a contract, we must give effect to the parties' intentions, as expressed in their agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). We look to the language of the parties' agreement and give a contract's language its plain, grammatical meaning unless it "would clearly defeat the parties' intentions." *Id.* (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). "We construe contracts under a de novo standard of review." *Id.*

### B.    Construction of Section 9.1

Section 9.1 provides:

[Rainbow Energy] shall not be obligated to balance receipts and deliveries of gas on a daily basis unless, on or for any Day, either [AMID] or [Rainbow] is requested or required by an upstream or downstream party to balance receipts and deliveries of gas attributable

34

to [Rainbow]. If [AMID] is requested or required by an upstream or downstream party to balance receipts or deliveries of gas that are attributable to [Rainbow], [AMID] may cease receiving gas from or delivering gas to or for [Rainbow] until the upstream or downstream party no longer requests or requires Transporter [AMID] to balance receipts and deliveries of [Rainbow's] gas.

The trial court adopted Rainbow's interpretation of Section 9.1, making the following conclusion of law regarding its construction:

It is unambiguous under Section 9.1 of the MAG-0005 that AMID was excused from providing firm balancing service to Rainbow if and only if Transco either (a) requested or required AMID to balance scheduled quantities with physical deliveries of gas at the Magnolia-Transco Interconnect where Rainbow's use of the MAG-0005 created an imbalance between scheduled quantities and physical deliveries at that point; or (b) requested or required Rainbow or AMID to balance Rainbow's receipts and deliveries on Transco where use of the MAG-0005 would create an imbalance between Rainbow's scheduled receipts and scheduled deliveries on Transco.

AMID argues that the trial court's "many references to 'scheduled receipts,' 'scheduled deliveries' and 'physical deliveries' do not appear in the plain text of Section 9.1" and that the trial court erred "in adding its own extra-contractual, narrow language to Section 9.1."

The MAG-0005 allowed Rainbow to move up to 20,000 MMBtus of gas into and out of the Magnolia pipeline through the Magnolia-Transco interconnect. AMID agreed "to receive up to the MDQ [Aggregate Maximum Daily Quantity, or 20,000 MMBtus] of gas tendered at the Receipt Point [the Magnolia-Transco Interconnect] and to transport and redeliver the Equivalent Quantity to the account

35

of [Rainbow] at the Delivery Point [also identified as the Magnolia-Transco Interconnect] on a Firm basis."

Section 9.1 provided that Rainbow was not obligated to balance the receipts or deliveries, and it provided two exceptions to AMID's performance of this term. Section 9.1 stated that Rainbow did not need to balance receipts and deliveries on the Magnolia pipeline on a daily basis unless an upstream party requested or required balancing of "receipts and deliveries of gas attributable to [Rainbow]." Section 9.1 further provided that AMID could "cease receiving gas from or delivering gas to or for [Rainbow]" if AMID was requested or required by an upstream party to "balance receipts or deliveries of gas that are attributable to [Rainbow]."

AMID agrees that Section 9.1 is unambiguous, as the trial court found. AMID argues, however, that the trial court erred in relying on extrinsic evidence to insert "many nuanced distinctions into Section 9.1 regarding scheduling imbalances and physical imbalances." This argument, however, ignores the entirety of the MAG-0005 and the language of Section 9.1.

In construing a contract, we strive to give effect to all the provisions of the contract so that none will be rendered meaningless. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805, 808 (Tex. 2012). We construe phrases and words "in conjunction with the specific rights and obligations contained in the

contract." *See id.* at 808. Unless there is an indication that the parties intended to give a word a technical or special meaning, we give the terms their "plain, ordinary, and generally accepted meaning." *Id.*

Section 9.1 sets out two clauses providing limitations on Rainbow's right to be out of balance on the Magnolia pipeline and AMID's obligation to perform under the MAG-0005. The first sentence of Section 9.1 provides that Rainbow was not obligated to balance receipts and deliveries on a daily basis unless AMID or Rainbow was requested or required by a party like Transco "to balance receipts *and* deliveries of gas attributable to [Rainbow]." (Emphasis added.) The second sentence further provides that if AMID is requested or required by a party like Transco "to balance receipts *or* deliveries of gas that are attributable to [Rainbow]", then AMID can cease receiving or delivering gas from or to Rainbow. (Emphasis added.)

We cannot read these two distinct clauses as excusing AMID from performance under the MAG-0005 because a party like Transco had issued a general OFO or general request. Rather, the requests or requirements from a party like Transco were required to meet the express provisions in Section 9.1—that the requests address the specific balancing concerns implicated by Section 9.1 and that they be "attributable to" Rainbow.

Furthermore, the two sentences of Section 9.1 use different language to raise two different balancing concerns. Sentence 1 of Section 9.1 references both AMID and Rainbow and requires that the request from a party like Transco require "balance[ing] receipts *and* deliveries of gas attributable to [Rainbow]." (Emphasis added.) This necessarily implicates a point-to-point imbalance or scheduling imbalance—an imbalance between receipts scheduled into the pipeline and deliveries scheduled out of the pipeline. This comports with the trial court's construction that AMID was excused from performing if a party like Transco "requested or required Rainbow or AMID to balance Rainbow's receipts and deliveries on Transco where use of the MAG-0005 would create an imbalance between Rainbow's scheduled receipts and scheduled deliveries on Transco."

Sentence two of Section 9.1 sets out an additional provision. It states that AMID could quit receiving gas from or delivering gas to or for Rainbow if a party like Transco required it to balance "receipts *or* deliveries." (Emphasis added.) This implicates a single-point imbalance or operational imbalance—an imbalance between the amount of gas scheduled to move through a point like the Transco-Magnolia interconnect and the amount of gas actually measured at that point. This comports with the trial court's construction that AMID was excused from performing if Transco "requested or required AMID to balance scheduled quantities with physical deliveries of gas at the Magnolia-Transco Interconnect

38

where Rainbow's use of the MAG-0005 created an imbalance between scheduled quantities and physical deliveries at that point."

American Midstream argues that the trial court erroneously considered extrinsic evidence, such as the terms of the OBA and expert testimony, in construing Section 9.1. We disagree. Based on the trial court's findings, it does not appear that the trial court improperly considered extrinsic evidence to construe Section 9.1.

The parol evidence rule, which "applies to writings that evidence the creation, modification, termination, or securing of a right or obligation under the contract," bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement. *Barrow-Shaver Res.*, 590 S.W.3d at 483. Specifically, "[e]vidence of prior or contemporaneous agreements is inadmissible as parol evidence when the contract is unambiguous." *Id.* (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010)).

Nevertheless, "a court may still consider surrounding facts and circumstances as an aid in the construction of the contract's language." *Id.* (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017), internal quotation marks omitted). While "evidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning,' extrinsic evidence can be

39

considered only to interpret an *ambiguous* writing, not to create ambiguity." *Id.*;

*see Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015).

In *Barrow-Shaver*, the supreme court held that evidence of the parties'

substantive negotiations directly related to the creation of their unambiguous

contract and, thus, the parol evidence rule barred consideration of evidence of the

parties' substantive negotiations. 590 S.W.3d at 483. The court went on to hold:

> We can consider the surrounding circumstances, however, including
> the fact that negotiations took place between sophisticated parties in
> this commercial oil and gas context. *See, e.g.*, [*Kachina Pipeline*, 471
> S.W.3d at 450] (recognizing that a court may consider objective
> factors of the facts and circumstances surrounding the context of the
> parties' contract, such as the setting in which the contract was
> negotiated, commercial or otherwise (citation omitted)). In *URI, Inc.
> v. Kleberg County*, we explained that:
>
> > the "facts and circumstances" extant at the time a contract is
> > executed may be consulted only to inform the meaning of the
> > language the parties chose to effectuate their accord. In construing
> > an unambiguous contract or in determining whether an ambiguity
> > exists, courts may not seek the parties' intent beyond the meaning
> > the contract language reasonably yields when construed in
> > context.
>
> 543 S.W.3d at 763. "[S]urrounding facts and circumstances cannot be
> employed to 'make the language say what it unambiguously does not
> say' or 'to show that the parties probably meant, or could have meant,
> something other than what their agreement stated.'" *Id.* at 757
> (citations omitted).

*Id.* at 483–84.

Given this precedent, we conclude that the trial court did not violate the

parol evidence rule in construing the MAG-0005. Nothing in the trial court's

40

conclusion of law interpreting Section 9.1 indicated a reliance on anything beyond the language used by the parties in Section 9.1 specifically and in the MAG-0005 generally. To the extent that the trial court used the surrounding facts and circumstances—i.e., that the negotiation of the MAG-0005 occurred between sophisticated parties knowledgeable in commercial natural gas transactions—to inform its conclusions, there is no indication that those circumstance served to alter the meaning of the words chosen by the parties in the MAG-0005. *See id.*

Rather, the two different clauses in Section 9.1 must be construed in a way that gives effect to both without rendering any of the provisions meaningless. *See El Paso Field Servs.*, 389 S.W.3d at 808. The evidence that AMID complains of—including AMID's OBA with Transco, Transco's FERC tariff, and expert testimony regarding how these transactions actually occurred—does not alter the meaning of the MAG-0005. The differences in meaning as construed above is based on the language of the MAG-0005 itself.

## C.  Evidence Supporting the Finding of Breach of the MAG-0005

In light of the proper construction of the MAG-0005, we now consider the sufficiency of the evidence supporting the trial court's findings that AMID breached the contract.

The trial court's findings of fact identified seven specific days on which AMID breached the MAG-0005. The trial court concluded that "AMID's refusals

41

to provide service constituted a material breach of MAG-0005 and effectively made the firm balancing service interruptible, destroying the benefit of the bargain." The trial court further concluded that "[t]here is no evidence of any request or requirement meeting [the criteria set out in Section 9.1] that would excuse AMID from performing or prevent Rainbow from using the MAG-0005." The trial court specified that "[n]o request or requirement from Transco was issued excusing AMID from performing" and thus, "[t]here is no excuse for AMID's breach."

AMID does not dispute that it limited or curtailed Rainbow's nominations under the MAG-0005 on the days identified by the trial court. It disagrees, however, with the legal significance that the trial court ascribed to the curtailments. AMID asserts that the breaches identified by the trial court in its findings "fall into two overlapping categories: (1) days when there was an OFO or critical alert from Transco, and (2) days when [AMID] advised Rainbow via instant message to nominate less than 20,000 MMBtu of balancing services but did not curtail a nomination." AMID argues that the Transco's OFOs and critical alerts "satisfied the conditions in Section 9.1 of the MAG-0005 [excusing AMID from providing balancing services] as a matter of law":

> [The OFOs] all were issued in Zone 4 where the Magnolia-Transco interconnect is located. They all apply to every shipper on the Transco pipeline, including Rainbow. And they all requested or required shippers to limit imbalances. Therefore, as a matter of law, Rainbow

had no right to be out of balance under Section 9.1 of the MAG-0005 on any day an OFO or critical alert was in place.

Thus, AMID asserts that these incidents do not constitute breaches of the MAG-0005 because AMID's performance was excused under the contract's terms.

The OFOs at issue here are imbalance OFOs that Transco issued to make adjustments in daily receipts or deliveries on the Transco pipeline over the specified period of time to maintain a current or cumulative balance between its customer's receipts and deliveries in accordance with the terms of Transco's transportation rate schedules. The OFOs directed shippers to limit imbalances on the Transco pipeline between receipts and deliveries to specific levels. For example, the OFO issued for January 10, 2016, provided for a "tolerance % allowed" of 5%. The OFOs also identified the zone impacted, and they could identify "affected shippers."

Contrary to AMID's argument, none of the OFOs reference gas attributable to Rainbow as creating an imbalance on the Transco pipeline. Furthermore, the OFOs at issue here stated that OBA parties, like AMID, were not subject to the OFOs. Thus, AMID failed to present evidence that the OFOs excused its performance under the MAG-0005. Rainbow presented evidence that it had a pooling agreement with Transco that required Rainbow to always balance its receipts and deliveries on the Transco pipeline and, as a result, its receipts and deliveries on the pipeline were balanced. And AMID's George Matthews testified

43

that, regardless of the OFOs, it was possible that AMID could have met its obligations to Rainbow to allow it to be out of balance on the Magnolia pipeline under the MAG-0005 through other means such as purchasing or selling gas from other parties, but AMID did not consider doing so.

Thus, Rainbow presented evidence that these OFOs did not fall within Section 9.1's exceptions for AMID's performance of the MAG-0005. The OFOs and critical alerts identified by AMID did not apply to OBA parties, like AMID, and Rainbow's nominations would not have caused an imbalance on the Transco pipeline. Rainbow established that AMID could have used "other available tools" to fulfill the terms of the MAG-0005, such as purchasing gas from other shippers. Instead, AMID limited Rainbow's nominations. We conclude that the evidence was, thus, legally sufficient to support the trial court's breach findings. *See Emerald Oil & Gas*, 348 S.W.3d at 215 (holding that appellant who attacks legal sufficiency of finding on which it did not have burden of proof must demonstrate that no evidence supports challenged finding).

AMID asserts that its "advice" that Rainbow limit nominations on November 22, 2016, and during the summer of 2016 did not constitute a breach of the MAG-0005 because it did not actually curtail any of Rainbow's nominations on those dates. AMID argues that, to demonstrate breach, Rainbow had to provide

44

evidence that it made a nomination that AMID curtailed.[4] But this argument disregards the contractual terms and the evidence of the parties' conduct.

The communications from AMID to Rainbow informing Rainbow that there was limited capacity and that Rainbow could not use its full 20,000 MMBtu in services occurred while Rainbow was considering and preparing its nominations. Evidence indicated that the communications could not be considered "advice" that Rainbow could disregard. AMID's scheduler in charge of the Magnolia pipeline testified that shippers like Rainbow were expected to comply with his instructions. And Rainbow's president, Tschider, testified that Rainbow could not make downstream deals to sell gas if it would not be able to obtain the supplies through the MAG-0005. If Rainbow proceeded to make a nomination it had already been told could not be confirmed, Rainbow would expose itself to additional loss and difficulty in meeting its obligations to its own customers. Thus, Rainbow presented evidence that when AMID told Rainbow that it could not make a full nomination for a particular day, regardless of whether AMID limited its performance before or

---

[4]  Rainbow argues that submitting a nomination even after it was told via instant message that the capacity was not available would have been "futile." *See, e.g.*, *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594–95 (Tex. 2008) (observing that Texas law generally does not require performance of futile acts). AMID characterizes this argument as "a theory of anticipatory breach," and it argues that there is no evidence of anticipatory breach because AMID's statements to Rainbow did not amount to a complete repudiation of the contract. As discussed above, the trial court found that AMID's conduct in this regard—telling Rainbow that it could not make a nomination for the full 20,000 MMBtus on certain days—was itself a breach of the contract's terms.

45

after Rainbow made the official nomination, AMID breached the terms of the MAG-0005.

Additionally, AMID's argument that it did not breach the MAG-0005 when in merely informed Rainbow that it could not use the full benefits (as opposed to curtailing a nomination after Rainbow made it) does not comport with the contractual obligations set out. AMID argues that there is no evidence that it refused service on those days because Rainbow never made a nomination that was actually refused by AMID. We observe, however, that the MAG-0005 obligated Rainbow to pay the contractual demand charges, regardless of its actual usage of the MAG-0005. In return, AMID agreed to firm—not interruptible—capacity of up to 20,000 MMBtus per day for Rainbow to use at its discretion. Nothing in the contract required Rainbow to make a full nomination for capacity that AMID had already said was not available.

In breach of its obligations, AMID told Rainbow on multiple occasions that it could not provide the full 20,000 MMBtu promised in the MAG-0005. As the trial court concluded, there was no evidence of an OFO or other request that met the criteria of Section 9.1 that would have excused AMID's performance. These repeated, unexcused failures to perform constituted a material breach of the MAG-0005 by AMID and, as the trial court held, "effectively made the firm balancing service interruptible."

46

We conclude, after considering all the evidence in a neutral light, that the trial court's findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that the evidence is factually sufficient to support the trial court's findings of breach.

## D. AMID's Repudiation of the MAG-0005

Rainbow argues that, in addition to the specific refusals of service discussed above indicating that AMID treated the MAG-0005 as an interruptible rather than firm, AMID expressly repudiated the MAG-0005 in December 2016. The trial court found that De La Rosa's statements on AMID's behalf during the December 7, 2016 call constituted a repudiation of the MAG-0005. AMID argues, however, that the evidence is legally and factually insufficient to support the trial court's repudiation finding.

To constitute a repudiation, a party to a contract must have absolutely and unconditionally refused to perform the contract without just excuse. *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Repudiation of a contract is a "positive and unconditional refusal to perform the contract in the future," evidenced by "conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract." *CMA-*

47

*CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 519 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Prior to the December 7, 2016 phone call, Rainbow had expressed its concerns that AMID was not performing as required by the MAG-0005 because Rainbow had not been able to utilize the entire 20,000 MMBtu of capacity as needed. During the phone call, De La Rosa and other representatives from AMID expressly stated that AMID could not maintain the promised volume of 20,000 MMbtu because, realistically, AMID could only provide 10,000 MMBtu. De La Rosa stated that Rainbow needed to understand that the MAG-0005 was interruptible rather than firm, and AMID made it clear that these changes limiting service to Rainbow under MAG-0005 were made so that AMID could "stay under the radar" with Transco.

AMID argues, essentially, that these statements were not a repudiation of the MAG-0005, but rather that the parties were discussing changes in the industry and in Transco's policies that had impacted the parties' performance under the MAG-0005. AMID asserts that the statements of De La Rosa and its other representatives on the December 7 phone call were not an unequivocal, absolute refusal to perform under the MAG-0005. It argues: "Neither De La Rosa, nor anyone else on the December 7 call, stated that [AMID] would refuse to allow Rainbow to be out of balance *absent* a request or requirement from Transco to stay in balance. And both

48

parties agreed to 'huddle up' to address Transco's restrictions moving forward." But the transcript of the call itself supports the trial court's determination that AMID expressed that it was no longer able to perform the MAG-0005 as agreed.[5]

AMID also argues that Rainbow "elected to continue performance under the MAG-0005 after each alleged breach and repudiation." It asserts that Rainbow, as the non-breaching party, could "choose either to treat the contract as terminated or as continuing; it cannot do both," citing *Man Industry (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (breach), and *El Paso Production Co.*, 112 S.W.3d 616 (repudiation) to support its contentions. AMID points to the fact that the parties did not cease performance until January 13, 2017, "nearly six weeks after the alleged repudiation and one month after the last alleged breach." However, AMID's cases supporting its arguments about "seeking to benefit from the contract or insisting on continued performance 'operates as a conclusive choice,' depriving the non-breaching party of an excuse to terminate its own performance" are distinguishable. Both *Smithdale Court Inc. v. Keely*, No. 01-92-00018-CV, 1993 WL 282922 (Tex.

---

[5]     AMID argues, "Even if there were some evidence of breach or repudiation, . . . [it] was excused as a matter of law from performing after Rainbow wrongfully terminated the MAG-0005 on February 1, 2017." As we held above, the evidence supported the trial court's conclusion that AMID breached and ultimately repudiated the MAG-0005. Thus, Rainbow's termination of the contract was not "wrongful." And, as we discuss further below with regard to damages, AMID's breach and subsequent repudiation caused Rainbow lost profits for the term of the MAG-0005 contract.

App.—Houston [1st Dist.] Jul. 29, 1993, no pet.) (not designated for publication) and *Levco Construction, Inc. v. Whole Foods Market Rocky Mountain/Southwest L.P.*, 549 S.W.3d 618 (Tex. App.—Houston [1st Dist.] 2017, no pet.) involved finite performance—a contract for sale of a home and a construction contract, respectively. *See Smithdale Ct. Inc.*, 1993 WL 282922, at *3; *Levco Constr.*, 549 S.W.3d at 643, 645. They are not contracts, like the MAG-0005, that would be performed as discrete transactions conducted on an on-going basis. The fact that Rainbow continued to negotiate to see if it could retain the benefit of the MAG-0005 agreement does not constitute an election to continue the contract. *See Man Indus.*, 407 S.W.3d at 368.

We conclude that the evidence is legally and factually sufficient to support the trial court's repudiation findings. *See Emerald Oil & Gas*, 348 S.W.3d at 215; *Cain*, 709 S.W.2d at 176.

We overrule AMID's second issue.

## Damages

In its third issue, AMID argues that, even if we conclude that the trial court's liability findings stand, Rainbow Energy's damages are nevertheless unrecoverable.

## A.    Relevant Law

"The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Damages for breach of contract may include both direct and consequential damages. *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022). Direct damages include restoring "the benefit of a plaintiff's bargain." *Id.* Consequential damages "compensate the plaintiff for foreseeable losses that were caused by the breach but were not a necessary consequence of it." *Id.*

"The normal measure of damages in a breach-of-contract case is the expectancy or benefit-of-the-bargain measure." *Parkway Dental*, 391 S.W.3d at 607. The purpose of this measure of damages is to restore the injured party to the economic position it would have occupied had the contract been performed. *Id.* at 607. "To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it." *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.) (citing *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex. App.—Austin 1998, pet. denied)). Benefit-of-the-bargain damages

51

include lost profits that are proved with reasonable certainty. *See Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015); *see also USPLS, LC v. Gaas*, No. 01-20-00604-CV, 2022 WL 3722135, at *8 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, pet. filed) (mem. op.) ("Lost profits may be either direct damages—profits lost on the contract itself—or consequential damages—profits lost on other contracts resulting from the breach.").

The Supreme Court of Texas has set out the rules concerning the sufficiency of evidence of lost-profits damages:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that [it] suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 859–60 (Tex. 2017) (quoting *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010)).

"Thus, lost profits damages can be recovered only when both the fact and amount of damages is proved with reasonable certainty." *Id.*; *see Cash Am. Pawn, LP v. Alonzo*, No. 01-19-00801-CV, 2021 WL 4155795, at *8 (Tex. App.—

52

Houston [1st Dist.] Sept. 14, 2021, no pet.) ("Lost profits are damages for the loss of net income to a business measured by reasonable certainty."). The "general rule" for obtaining recovery of lost profits as damages requires the party to demonstrate that "a loss of profits is the natural and probable consequence of the act or omission complained of" and establish the amount of lost profits "with sufficient certainty." *Horizon Health Corp.*, 520 S.W.3d at 860 (quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)); *see Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

"Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Cash Pawn Am.*, 2021 WL 4155795, at *8; *see Phillips*, 475 S.W.3d at 279; *ERI Consulting Eng'rs*, 318 S.W.3d at 876. However, "anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." *Horizon Health Corp.*, 520 S.W.3d at 860 (quoting *Tex. Instruments, Inc.*, 877 S.W.2d at 279). "The law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." *Id.* (quoting *Phillips*, 475 S.W.3d at 280). "When the evidence

supporting a claim for lost profits damages is largely speculative or a mere hope for success, lost profits have not been established with reasonable certainty." *Id.* (citing *Tex. Instruments, Inc.*, 877 S.W.2d at 279).

While the proper measure of damages is a question of law that we review de novo, *Signature Indus. Servs.*, 638 S.W.3d at 187, the question of what constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Phillips*, 475 S.W.3d at 279. The fact finder generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).

## B.    The Trial Court's Damages Findings

The trial court found damages against AMID as follows: (1) $6,145,215.89 for lost profits as the benefit-of-the-bargain damages supported by breach of contract and fraud findings; (2) $3,215,923.72 for benefit-of-the-bargain damages related to AMID's repudiation, measured by the alleged lost profits from forward sales beginning in January 2017; or (3) $991,550.61 for out-of-pocket damages, supported by breach of contract, fraud, repudiation, and negligent misrepresentation findings, measured by the demand charges Rainbow paid under the contract minus its net revenue. Rainbow Energy elected to recover its $6,145,215.89 benefit-of-the-bargain damages, as measured by its lost profits, on the breach of contract finding.

54

The trial court found that it "was foreseeable to AMID that Rainbow would use the MAG-0005 to supply forward contracts with its customers after Rainbow was able to confirm the reliability of the MAG-0005" and that "Rainbow would not be able to use the MAG-0005 to supply forward contracts if it was not reliable on days that Rainbow tested the MAG-0005."

The trial court considered AMID's refusal of services on January 8 and January 22, 2016, and held, "Had AMID performed as promised in January 2016, it is reasonably certain Rainbow would have entered into forward sales contracts with its customers for February 2016 at a price of $4.069/MMBtu and for March 2016 at a price of $1.911/MMBtu (the NYMEX LDS for the month plus the average basis reported by the Intercontinental Exchange)." The trial court further found that Rainbow "suffered immediate damages" when AMID curtailed its February 11, 2016 nomination and it was required to purchase more expensive gas to satisfy its obligations to its customers. The trial court further found that AMID's "ongoing non-performance" caused Rainbow to determine that it "could not reliably enter into any forward sales contracts for the 2016-2017 winter season using the MAG-0005 without incurring substantial risks," so it "used the MAG-0005 to support daily trades only." This was followed by AMID's additional failure to perform and the December 7 phone call in which De La Rosa stated that the MAG-0005 would have to be viewed as interruptible going forward.

The trial court concluded that AMID's conduct "effectively made the firm balancing service interruptible, destroying the benefit of the bargain for Rainbow." This material breach "proximately and foreseeably damaged Rainbow by making it impossible for Rainbow to reliably enter into forward sales with customers—under which Rainbow would have earned profits."

Looking at Rainbow's damages model, the trial court concluded that it was "reasonably certain that Rainbow would have realized lost profits had AMID performed its obligations under the MAG-0005 Agreement" and that "Rainbow would have realized the revenue reflected in the Damages Model with forward sales contract with customers (for February-March 2016, November 2016-March 2017, and November 2017-March 2018) and increased daily trading in January 2018." The trial court determined that the Damages Model accurately reflected Rainbow's actual net profits using the MAG-0005 and Rainbow's expected net profits that it would have realized had AMID performed according to the contract's terms.

Thus, the trial court determined that, to restore Rainbow to the economic position that it would have occupied had AMID performed, the damages had to account for the profits that Rainbow lost because it could not rely on the MAG-0005 as a firm balancing agreement. These lost profits were calculated based on the established demand of existing customers and revenue and costs based on

Rainbow's own transactions under other agreements or index prices. The damages model accounted for mitigated damages, considering that Rainbow used the MAG-0005 to the extent that it could for daily trades.

AMID now argues that (1) there is insufficient evidence of the proper measure of damages; (2) Rainbow's lost-profits model rests on unfounded assumptions; and (3) Rainbow failed to prove lost profits with reasonable certainty.

## C.     The Proper Measure of Rainbow's Damages

AMID first argues that "there is legally and factually insufficient evidence of the proper measure of damages." AMID asserts that the "award of damages failed to account for the value of the MAG-0005 as a transportation contract," noting that "[t]ransportation services are different than balancing services" and "the MAG-0005 offered both." AMID argues that by its plain language, the MAG-0005 provided transportation services and that the trial court could not rely on parol testimony or Rainbow's own performance to change the terms as written.

We observe, however, that Rainbow's damages model is based on AMID's breach of its obligation to provide balancing services under the MAG-0005. Establishing damages flowing from that breach is not a matter of contract interpretation. In presenting evidence of its lost profits, Rainbow is not attempting to change the terms of the contract in a way that would implicate the parol evidence rule. *See Barrow-Shaver Res.*, 590 S.W.3d at 483 (holding that parol

evidence rule "applies to writings that evidence the creation, modification, termination, or securing of a right or obligation under the contract," and bars consideration of evidence that contradicts, varies, or adds to terms of unambiguous written agreements). Rather, Rainbow proved that AMID's breach of its obligation to provide the balancing services bargained for in the MAG-0005 caused damages, as required to establish its breach of contract claim. *See, e.g.*, *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (providing that plaintiff's damages resulting from breach is essential element of breach of contract claim). Rainbow was not obligated to assert or establish a breach of AMID's obligation to provide transportation services under the MAG-0005 to prove that Rainbow sustained damages because of AMID's breach of the balancing provision.

AMID further argues that, because Rainbow failed to present any evidence of the value of the MAG-0005 as a transportation contract, there is legally insufficient evidence to support the award of benefit-of-the-bargain or out-of-pocket damages, citing *Highland Capital Management L.P. v. Ryder Scott Co. See* 402 S.W.3d 719, 726–30 (Tex. App.—Houston [1st Dist.] 2012, no pet.). The contract and damages in *Highland Capital* are distinguishable from the damages here. In that case, this Court reviewed a trial court's grant of summary judgment dismissing appellant Highland Capital's claims for negligence and negligent

58

misrepresentation in part on the ground that the appellant presented no evidence as to the fair market value of the defective bonds at the time of their purchase. *Id.* at 727–28. The Court in *Highland Capital* concluded that, because there was no evidence of the value of what appellant received when it purchased the bonds, there was no way to calculate the difference between what it bargained for and what it actually received. Thus, there was no evidence to support its claim for damages. *Id.* Here, the MAG-0005 is a different kind of contract. It was not a contract for a one-time sale, but a contract to provide ongoing services and evidence of the value received at the time the parties entered the MAG-0005 is not an essential component of damages.

Rainbow's damages model demonstrated the essential components of its damages claim. Rainbow presented evidence of the difference between what it bargained for—a firm balancing contract that it could rely on to enter into forward sales contracts—and what it received—interruptible, unreliable performance that would not support forward sales contracts. The damages model used facts and data from Rainbow's ongoing operations to account for the revenue and costs surrounding the forward sales that it had anticipated in entering into the MAG-0005, and it accounted for the mitigation of those lost-profit damages by including the profit that Rainbow was able to realize under the MAG-0005 despite AMID's non-performance.

59

Furthermore, AMID's argument that Rainbow was required to present evidence of the value of the MAG-0005 solely as a transportation contract disregards the nature of the parties' ongoing business relationship. The parties had already negotiated and continued to perform under the MAG-0001 as a transportation contract. Rainbow's president Stacey Tschider asserted that the MAG-0005's benefit to Rainbow was as a balancing contract. The emails and other communications between the parties during negotiation of the MAG-0005, in which it was clear that Rainbow was seeking the balancing services that it negotiated for as a tool to expand its forward sales, likewise support the trial court's findings that the value of the MAG-0005 was a firm balancing agreement.

We conclude that the trial court did not err in determining damages based on the breach of the balancing services bargained for in the MAG-0005. *See Signature Indus. Servs.*, 638 S.W.3d at 187 (holding that proper measure of damages is question of law).

## D. Assumptions Underlying Damages Model

AMID further argues that the award of lost profits as benefit-of-the-bargain damages fails as a matter of law because the lost profits model relied on assumptions that vary from the facts and that do not fill the "reasonable certainty" the law requires. We disagree.

As Rainbow points out in its briefing, AMID does not attack the revenue or costs identified in the damages model. AMID asserts in its reply brief that "[t]his Court may assume that data is correct," but it argues that the model itself was flawed. AMID and Rainbow thus take two different views of how to determine the proper damages resulting from the breach here. AMID contends that damages were only available for days that Rainbow attempted to use the MAG-0005 but was unable to do so. AMID argues that the damages model is flawed because it assumes that AMID refused balancing services on days when there are no findings of breach and no evidence of any refusal of service by AMID.

Under Rainbow's model, however, the damages flowed from the breach of the term making performance "firm," not from any one denial of service. Rainbow asserted, and the trial court found, that by failing to treat the contract as firm, AMID destroyed the benefit of the bargain. AMID's treatment of the MAG-0005 contract as interruptible made AMID's performance unreliable. Thus, Rainbow could not rely on the MAG-0005 as a tool to fulfill forward sales to its own customers. The loss of this business resulted in millions of dollars of lost profits.

AMID argues that Rainbow's lost-profits model was based on assumptions that were not supported by the facts, including assumptions that Rainbow would have entered into forward sales contracts to sell gas at locked-in prices in Zone 5, based at least in part on using the balancing services under the MAG-0005 to buy

the gas in Zone 4. AMID also argues that Rainbow's damages model theorizes that Rainbow "would have used the MAG-0005 on many days in which Rainbow did not in fact use the MAG-0005." Thus, AMID argues that Rainbow's estimate of its lost profits "falls far afield of the 'reasonable certainty' the law requires."

These arguments disregard the evidence that the value of the MAG-0005 to Rainbow was in its reliability to use it as needed to supply gas for forward sales. Rainbow presented evidence, in the form of testimony from Tschider and Coorsh, among others, that the benefit of the MAG-0005 was to be used on days of high pricing in Transco's Zone 5 and that made the MAG-0005's reliability necessary even if it was not used daily or even monthly. Tschider and Phelan testified for Rainbow regarding the demand it received from established customers. Rainbow presented evidence of requests for service from companies like Duke Energy and others, seeking more gas than Rainbow was able to provide. Tshcider and Phelan testified that, if Rainbow could have relied upon AMID's performance under the MAG-0005, Rainbow would have entered into larger or additional forward sales contracts to meet this demand.

Thus, Rainbow's damages model was supported by evidence that it had customers willing to enter into forward sales contracts for the months identified and at the prices reflected in their model, based on the average publicly-available pricing index. But Rainbow was unable to enter into these contracts because AMID

failed to perform its obligations under the MAG-0005. Rainbow acknowledges that it did not actually attempt to use the MAG-0005 on all the days that it would have used it had AMID performed reliably. Tschider testified that Rainbow did not enter into the anticipated forward sales contracts because AMID breached the MAG-0005 by treating it as interruptible. Because Rainbow did not have the forward sales contract in place, it used the MAG-0005 for daily trades only. This accounted for the difference between the days that Rainbow actually used the MAG-0005 and the usage as reflected in the damages model. We conclude that this evidence supports the trial court's determination that these discrepancies do not render the damages model unreliable.

AMID also argues that Rainbow's trading strategy was "hypothetical" and constituted a "new and unproven" trading strategy that was a "risk" and "at odds with Rainbow's 25-year trading history." This misrepresents the evidence presented at trial. Tschider testified that Rainbow had entered into hundreds of forward sales contracts over its years of operation and that it was a commonly-used trading strategy. Coorsh testified that using forward contracts was the most conservative way to do business because it created certainty regarding costs and profit. And according to Coorsh, Rainbow's damages model determined the lost revenue components using "actual forward transactions that were executed by Rainbow" in conjunction with the MAG-0001 contract.

Coorsh also testified that Rainbow's anticipated use of the MAG-0005 as a tool to support additional forward sales to its customer base was "a reasonable strategy" that was based on "what they have done in the past" and "the way that they conduct their business":

> There is no reason to expect from an experienced gas trading and marketing perspective that they would do something totally different than what they have done in the past. Their entire business is serving customers with reliable supply. This [the MAG-0005] is just one more way to do that. I would not anticipate to see written documentation explicit to one contract saying that this is what we are going to do, especially when the plan is to do what they have always done and expect to do in the future.

Thus, Coorsh's testimony supports the trial court's findings that the purpose behind Rainbow's "testing" of the MAG-0005 was to establish the reliability of AMID's performance, not the feasibility of entering into forward sales as a general strategy.

## E. Damages Established with Reasonable Certainty

AMID argues that, even if Rainbow established the fact of its lost-profits damages, it failed to prove the amount of damages with the reasonable certainty required by Texas law. However, the strategies and related lost profits here were supported by expert testimony and Rainbow's own extensive business conducted under other contracts. Rainbow's experts acknowledged that natural gas trading involves some risk and uncertainty, but it nevertheless presented sufficient evidence based on how the market unfolded for the relevant periods to support its

damages model. And as Coorsh and Phelan testified, the figures used in AMID's damages model were conservative.

Coorsh addressed AMID's contention that the damages model "used the market with 20/20 hindsight." He disagreed, stating, "There is no hindsight. The model is a reflection of what they would have done in the real world." He pointed out, for example, that the model for January 2018 showed projected sales using the MAG-0005 that would have resulted in Rainbow losing approximately $1 million dollars. Coorsh testified that this loss demonstrates that Rainbow did not use hindsight to create the model, because the use of hindsight would have prevented a model containing projected losses. He also pointed to December 2017 as another example. In that month, Rainbow had only minimal lost profits. He stated, "If they had hindsight, they would have changed the dates in which they put gas to Magnolia so that they would have made money. But they didn't do that. Okay? They showed what decisions they would have made on a day-to-day basis."

Rainbow used objective facts and data regarding market performance, including its own performance on other contracts like the MAG-0001 to existing customers and the average prices of gas during the period for which it missed the identified opportunities to supply additional gas to its customers. AMID's briefing does not identify any particular revenue or cost figures as being unsound. We conclude that the evidence presented by Rainbow was sufficient for the trial court

to determine the amount of lost-profit damages with reasonable certainty. *See Horizon Health Corp.*, 520 S.W.3d at 859–60.

We overrule AMID's third issue.

## AMID's Remaining Issues

In its first issue, AMID argues that Rainbow Energy's fraud and negligent misrepresentation claims fail because there is no evidence of a false representation and there is no evidence of justifiable reliance. However, the trial court's judgment is supported by the trial court's breach of contract findings, which we have affirmed. The tort findings would not afford any greater relief or damages, and so we need not address AMID's first issue. *See* TEX. R. APP. P. 47.1.

In its fourth issue AMID argues that it is entitled to recover on its own counterclaim for breach of contract. However, when one party to a contract commits a material breach of the contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam).

We have determined that the trial court properly concluded that AMID committed a material breach of the MAG-0005 and repudiated it by treating it as interruptible rather than firm. Thus, Rainbow was discharged or excused from further performance under the MAG-0005. *See id.* Because AMID cannot show that it tendered performance in connection with the MAG-0005, the trial court

66

properly concluded that it was not entitled to the demand charges it sought under the MAG-0005.[6]

We overrule AMID's fourth issue.

In its fifth issue, AMID argues, in the alternative, that we should remand the case for a new trial. It bases this assertion on its argument that the trial court misconstrued the MAG-0005. *See, e.g.*, *Best v. Falcon Rock Cmty. Ass'n*, 2018 WL 4139092, at \*1, \*4–5 (Tex. App.—Houston [14th Dist.] Aug. 30, 2018, no pet.) (remanding for new bench trial because trial court misconstrued unambiguous contract term). Because we have concluded that the trial court did not misconstrue the MAG-0005, we overrule AMID's fifth issue.

We overrule AMID's fifth issue.

### Rainbow's Request for Attorney's Fees

Rainbow sought attorney's fees from AMID, but the trial court ruled that Rainbow could not recover attorney's fees from AMID under Civil Practice and Remedies Code section 38.001 because AMID is a limited liability company.

This Court has previously held that Civil Practice and Remedies Code section 38.001 as it existed when this suit was filed does not authorize the recovery of attorney's fees in a breach-of-contract action against a limited liability

---

[6]    We note that Rainbow's damages model incorporates the demand charges due under the MAG-0005 as a cost in calculating its lost profits.

company.[7] *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 188 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Under the plain language of section 38.001, a trial court cannot order limited liability partnerships (L.L.P.), limited liability companies (L.L.C.), or limited partnerships (L.P.) to pay attorneys' fees."); *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 455 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We decline Rainbow's request that we overrule this precedent.

We overrule Rainbow's request for attorney's fees.

---

[7] The legislature amended Civil Practice and Remedies Code section 38.001 effective September 1, 2021, to permit recovery of attorney's fees from an individual or "organization," as defined by Business Organizations Code section 1.002. *See* Act of May 28, 2021, 87th Leg., R.S., ch. 665, § 1, 2021 Tex. Sess. Law Serv. (West) (to be codified at TEX. CIV. PRAC. & REM. CODE § 38.001). This suit was filed prior to that amendment taking effect, and so we apply the version that was in effect when this action was commenced. *See id.* § 2 (amendment applies to award of attorney's fees in action commenced on or after effective date of September 1, 2021).

## Conclusion

We conclude that the trial court's findings that AMID breached and repudiated the MAG-0005 and the findings of $6,145,215.89 in lost profit, benefit-of-the-bargain damages (plus $449,097.42 in prejudgment interest) were supported by sufficient evidence. We likewise conclude that the trial court correctly determined that AMID take nothing on its own breach of contract claim, and it properly denied Rainbow's claim for attorney's fees. Accordingly, we affirm the trial court's judgment.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Farris.

Farris, J., dissenting.